Ronald Ray TRYON *v.* STATE of Arkansas

CR 06-801                                                      263 S.W.3d 475

Supreme Court of Arkansas
Opinion delivered September 27, 2007

26

*Knutson Law Firm*, by: *Gregg A. Knutson*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Leaann J. Irvin* and *Farhan A. Khan*, Ass't Att'ys Gen., for appellee.

J IM HANNAH, Chief Justice. A Sebastian County jury convicted appellant Ronald Tryon of possession of a controlled substance (methamphetamine) with intent to deliver, possession of drug paraphernalia, and theft by receiving, for which he was sentenced, as a habitual offender, to life imprisonment, fifteen years, and thirty years, respectively, in the Arkansas Department of Correction. On appeal, he challenges the circuit court's denial of his motion for directed verdict regarding all three counts, the circuit court's denial of his motion to suppress evidence, the circuit court's denial of his motion to suppress his custodial statement, and the circuit court's failure to grant a mistrial or curative instruction regarding the State's closing argument during sentencing. As this is a criminal appeal in which a sentence of life imprisonment has been imposed, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and, accordingly, we affirm.

At trial, Alvin Trusty testified that, on March 16, 2004, he observed a man driving a small, white pickup truck pull up to the home of his neighbor, Louis Wofford. Trusty testified that he saw the man going around to all the doors of the Wofford residence and barn building. He stated that when the truck arrived, the truck bed appeared to be empty, but that when it left, it "[h]ad quite a bit in it." Trusty described the driver of the truck as a "white male, short, dirty looking, wearing a ball cap."

Wofford testified that on March 16, while he and his wife were at work, his wife received a phone call from Mrs. Trusty, stating that something suspicious was going on at the Wofford

home. When Wofford got home, he found the back door to his barn kicked in and discovered that most of the items of value had been taken out. Wofford made a list of items taken, including a Craftsman air compressor, a 75-foot air hose, a Lincoln 225 arc welder, a Delta electric compound miter saw, and various other items valued at a total of approximately $1,615.

Deputy Ron Morris of the Sebastian County Sheriff's Office testified that he responded to Wofford's residence in March 2004 regarding a break in. Deputy Morris stated that he was familiar with the description of the driver and of the truck given by Trusty, so he contacted Deputy Chandler Garrett to ask him to check Tryon's residence.

Deputy Garrett testified that as he pulled up to Tryon's residence, he saw a white truck, matching the description given by Morris, in the backyard. Further, Garrett stated that he saw an air compressor in the back of the truck. As he participated in a search of the truck and residence, Garrett saw several items matching the description of the stolen items. He noticed that there was a license plate clipped over the license plate belonging to the vehicle, and he said that when he ran the VIN number of the truck, it registered as belonging to Tryon.

Claude Ridge, Tryon's neighbor, testified that he saw Tryon leaving his residence alone on the morning of March 16, 2004, in his white Mazda truck. Ridge said that the bed of the truck appeared to be empty when Tryon left, but, when Tryon returned, the truck "had a lot of stuff in the back."

Suzanne Bobbitt, a parole officer with the Department of Community Corrections, conducted a search of Tryon's truck and residence on March 16, 2004. Bobbitt searched Tryon's truck and found a black coat in the passenger seat. She located a match box containing a blue baggy with methamphetamine inside the pocket of the coat. Bobbitt then searched Tryon's residence and found, in plain view in the southeast bedroom, a spoon with grayish residue, a set of scales on a table, a light bulb altered for smoking methamphetamine, plastic baggies with the corners cut out, and a razor blade. Bobbitt stated that these items would have been noticeable to someone who lived in the residence.

Benjamin Peacock, a forensic chemist with the Arkansas State Crime Laboratory, testified that he tested the items seized by Bobbitt in the search of Tryon's residence and truck. The off-white substance in the plastic baggy weighed 1.6512 grams and

tested to be 17.4% methamphetamine. Peacock testified that the dilution of methamphetamine with cutting agents was a common practice used so the methamphetamine could be distributed for more money. He also stated that sometimes cutting agents are used so that the methamphetamine will not be as potent when users shoot it into their veins.

Sergeant Brandon McCaslin, with the Sebastian County Sheriff's Office, testified that he arrived at Tryon's residence on March 16, 2004, after Deputies Garrett and Morris had arrived. After Tryon waived his *Miranda* rights, McCaslin conducted a taped interview with Tryon during which Tryon stated that he received the tools found at his residence from Wes Bradley. Tryon stated that Bradley borrowed his truck to get a compressor that Tryon was thinking about buying. Tryon said that when Bradley returned in the truck, he had a compressor, a welder, a crate with hand tools, and a skill saw. Tryon stated that Bradley wanted $275 for these items. Tryon admitted that he knew that the property "either had to be stolen or traded for drugs." He told McCaslin that the property was "illegal" and that paying $275 for all the property "was a heck of a buy." Tryon denied any knowledge of the methamphetamine found in his truck or items of paraphernalia found in his residence.

Tryon argues that the circuit court erred in denying his motions for directed verdict regarding the charges of possession of a controlled substance (methamphetamine) with intent to deliver, possession of drug paraphernalia, and theft by receiving. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004). When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002). Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Tillman v. State*, 364 Ark. 143, 217 S.W.3d 773 (2005).

*Possession of Methamphetamine and Drug Paraphernalia*

Except as authorized by law, "it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver a controlled substance." Ark. Code Ann. § 5-64-401(a) (Supp. 2003). "Any person who violates this subsection with

respect to [a] controlled substance classified in Schedules I or Schedule II, which is a narcotic drug or methamphetamine, and by aggregate weight, including an adulterants or diluents, is less than twenty-eight grams (28 g.), is guilty of a felony and shall be imprisoned for not less than ten (10) years nor more than forty (40) years, or life, and shall be fined an amount not exceeding twenty-five thousand dollars ($25,000)." Ark. Code Ann. § 5-64-401(a)(1)(i) (Supp. 2003).

"It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance" in violation of statutory law. Ark. Code Ann. § 5-64-403(c)(1)(A)(i) (Supp. 2003).

Tryon first argues that the circuit court erred in denying his motion for directed verdict for possession of a controlled substance (methamphetamine)[1] and possession of drug paraphernalia, when the items were found in a place jointly occupied or accessible by others, and there were not other factors to link him to the items found. Tryon claims that he was not in possession of the methamphetamine that was found in the truck on his property. He states that he was not in the truck when the methamphetamine was discovered. Further, Tryon refers to his custodial statement that he loaned his truck to Wes Bradley the day that the methamphetamine was found. Tryon states that it is possible that Bradley left the coat containing methamphetamine in the truck. In addition, he points out that he shared his house with his wife; thus, he did not have exclusive control over the items in the house and vehicle.

The State argues that, although it appears that Tryon makes a joint-occupancy claim regarding the methamphetamine found in the truck, the argument must fail because there is simply no evidence, other than Tryon's own statement, that anyone, other than Tryon, had possession or control of the truck. Further, the State contends that Tryon and Bradley were not found in the truck together, hence, there was a lack of joint occupancy. The State's argument is well taken. *See Malone v. State*, 364 Ark. 256, 217

---

[1] While Tryon was convicted of possession of a controlled substance (methamphetamine) with intent to deliver, he argues the intent-to-deliver element of the conviction in a separate point on appeal.

S.W.3d 810 (2005) (factors to be considered in cases involving vehicles *occupied by more than one person*); *see also Jones v. State*, 355 Ark. 630, 144 S.W.3d 254 (2004) (factors to be considered when the contraband is in the *joint control* of the accused and another).

The State also contends that there is substantial evidence that Tryon possessed the methamphetamine found in the truck. It is not necessary for the State to prove an accused physically held the contraband in order to sustain a conviction if the location of the contraband was such that it can be said to be under the dominion and control of the accused. *Heard v. State*, 316 Ark. 731, 876 S.W.2d 231 (1994). Possession may be implied when the contraband is found in a place that is immediately and exclusively accessible to the accused and subject to his dominion and control. *Jones, supra.* We must determine whether there is substantial evidence to show that Tryon was in constructive possession of the contraband found in the truck and residence.

In the present case, Deputies Morris and Garrett both testified that Tryon was the registered owner of the white truck found in his backyard and that no other person was found at Tryon's residence or in his yard. Trusty testified that he observed a white male matching Tryon's description at Wofford's residence. Trusty also stated that the man was driving a white truck. Tryon's neighbor, Claude Ridge, testified that he saw Tryon leave his residence in the white truck. Ridge stated that when Tryon left, the bed of the truck was empty, but when Tryon returned, the bed of the truck was full. Bobbitt testified that she found the coat with methamphetamine in Tryon's truck in Tryon's backyard. As the State points out, when the truck was searched, it was immediately and exclusively accessible to Tryon, and he was in close proximity to the methamphetamine.

As previously noted, the only evidence submitted by Tryon to refute any ownership or possessory interest in the truck was Tryon's own statement that Bradley had borrowed his truck. Clearly, the jury rejected Tryon's explanation. This court does not attempt to weigh evidence or assess the credibility of the witnesses, as that determination lies within the province of the trier of fact. *See, e.g., Williams v. State*, 338 Ark. 178, 992 S.W.2d 89 (1999). The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's. *Ross v. State*, 346

Ark. 225, 57 S.W.3d 152 (2001). Based on the foregoing, we believe there is substantial evidence that Tryon was in possession of methamphetamine.

As to his conviction for possession of drug paraphernalia, Tryon contends that there was an absence of evidence for the jury to infer that he had joint possession and control over the drug paraphernalia discovered in his home. Neither exclusive nor actual physical possession is necessary to sustain a charge of possessing contraband. *See Stanton v. State*, 344 Ark. 589, 42 S.W.3d 474 (2001). Here, Tryon relies upon *Ravellette v. State*, 264 Ark. 344, 571 S.W.2d 433 (1978), and like cases, for the rule that where there is joint occupancy of the premises there must be some factor in addition to the joint control to link the accused with the controlled substance. In *Ravelette*, there was no such evidence. There the co-defendant admitted that the marijuana found in the residence was his and exonerated the appellant of any knowledge of its presence or control. In this case, Tryon's wife, with whom he shared the residence, did not testify.

Here, there are facts connecting Tryon with the drug paraphernalia. Tryon lived in the residence, and at no point did he deny an ownership or possessory interest in the residence. Tryon was home alone when officers searched the residence. Testimony established that items of paraphernalia, the spoon with residue, the light bulb, the scales, and the plastic baggies were found in plain view in the southeast bedroom and that the items would have been noticeable to anyone who lived in the residence.

Still, Tryon contends that in his own recorded statement to police, he expressed surprise that methamphetamine was found in his house or in his truck. The record reveals that, at trial, Tryon's statement was read aloud by the deputy prosecuting attorney; thus, the jury had an opportunity to hear Tryon's contention that he had no knowledge of the methamphetamine or drug paraphernalia. The jury was free to determine the credibility of Tryon's statement and disregard Tryon's account of the events. *See Ross, supra.* We hold that there is substantial evidence to sustain a conviction for possession of drug paraphernalia.

### Intent to Deliver

For his second point for reversal, Tryon argues that the circuit court erred in denying his motion for directed verdict when there was insufficient evidence of his intent to deliver metham-

phetamine. Tryon moved for a directed verdict at the close of the State's case, claiming that there was insufficient evidence to establish the element of intent to deliver, notwithstanding Detective Darrell Miner's testimony.[2] The circuit court denied Tryon's motion for a directed verdict. Tryon renewed his motion at the close of all evidence, arguing that there was no evidence, in the absence of Detective Miner's testimony, of any trafficking. The circuit court again denied the directed-verdict motion, noting that the question of whether the 1.6512 grams of methamphetamine was for personal use or distribution was for the jury to determine, at which time Tryon argued that the statutory presumptive quantity would unconstitutionally shift the burden of proof and violate his right to due process.[3] This argument was also rejected by the circuit court.

On appeal, Tryon argues that there was no proof, even assuming that the methamphetamine was his, of his intent to distribute it. Specifically, Tryon argues that there was no evidence presented that the scales found in his home were for weighing methamphetamine and that there was evidence presented that the methamphetamine was cut with agents so it would be less potent for personal use.

The State argues that Tryon's arguments are not preserved for appellate review. We agree. Tryon moved for directed verdict, making a general claim that the State had not met its burden to prove intent to deliver, notwithstanding Detective Miner's testimony. However, Tryon did not explain how Miner's testimony failed to establish Tryon's intent to deliver. A directed-verdict motion is a challenge to the sufficiency of the evidence and requires the movant to apprise the trial court of the specific basis on which the motion is made. *See, e.g., Campbell v. State*, 319 Ark. 332, 891 S.W.2d 55 (1995). Arguments not raised at trial will not be addressed for the first time on appeal, and parties cannot change the grounds for an objection on appeal, but are bound by the scope and nature of the objections and arguments presented at trial. *See id.* Here, Tryon's motion for directed verdict, while timely, did not identify particular or specific elements of proof. Moreover, Tryon's arguments on appeal relating to the scales and the cutting

---

[2] Detective Miner of the Greenwood Police Department testified regarding his knowledge of narcotics and how methamphetamine is used and distributed.

[3] Tryon does not renew his constitutional challenge on appeal.

agents used in the methamphetamine were not part of Tryon's directed-verdict motion at trial. Consequently, Tryon's arguments are not preserved for review.

### Theft by Receiving

Tryon next argues that the circuit court erred in denying his motion for directed verdict on the charge of theft by receiving when there was no evidence that he knew or had reason to know that the tools purchased from Wes Bradley were stolen. A person commits the offense of theft by receiving if he or she receives, retains, or disposes of stolen property of another person, knowing that the property was stolen or having good reason to believe that the property was stolen. Ark. Code Ann. § 5-36-106(a) (Supp. 2003). The acquisition by a person of property for a consideration known to be far below its reasonable value shall give rise to a presumption that a person knows or believes that the property was stolen. Ark. Code Ann. § 5-36-106(c) (Supp. 2003).

■ In his statement to Sergeant McCaslin, Tryon stated that Bradley wanted $275 for several items, including an air compressor, a welder, a crate with several hand tools, and a saw. Tryon also admitted that he knew that the property "either had to be stolen or traded for drugs." He stated that the property was likely "[o]btained in illegal ways." He also agreed that buying all of the property for $275 was a "heck of a buy." Wofford, the victim of the theft, testified that the items taken from his home and found at Tryon's residence were valued at approximately $1615. Tryon's own statement that he knew the property was stolen or obtained illegally and that he paid $275 for the property, which was valued at $1615, is substantial proof that Tryon knew the items purchased from Bradley were stolen. As such, the circuit court did not err in denying Tryon's motion for directed verdict regarding the charge of theft by receiving.

### Motion to Suppress Evidence

Tryon argues that the circuit court erred in denying his motion to suppress evidence found in his backyard and residence because the evidence was found during an illegal search located in a place that was afforded protection by the Fourth Amendment and Article 2, § 15 of the Arkansas Constitution. He also argues that the evidence seized should be suppressed as fruit of the poisonous tree. In reviewing the denial of a motion to suppress, we

conduct a de novo review based on the totality of the circumstances, giving respectful consideration to the findings of the trial judge. *Blanchett v. State*, 368 Ark. 492, 247 S.W.3d 477 (2007). We will reverse a circuit court's ruling denying a motion to suppress only if the ruling is against the preponderance of the evidence. *See Hart v. State*, 368 Ark. 237, 244 S.W.3d 670 (2006).

At the suppression hearing, Deputy Garrett testified that he was the first to arrive at Tryon's residence. Garrett stated that Deputy Morris called him and told him that a large air compressor and some other tools had been taken from Wofford's residence. Morris related to Garrett that a witness had observed a white male in a small, white pickup truck taking the property. Because they had "dealt with [Tryon] in incidents past," and because Garrett knew that Tryon drove a small, white pickup, they decided that Garrett should go to Tryon's residence. Garrett testified that he drove to Tryon's house, and that from the road, and when he first pulled onto the driveway, he had a view of the backyard. In the backyard, Garrett saw a white truck with an air compressor in the truck bed that matched the description he had gotten from Morris. Next, Garrett observed a short, white male with shaggy hair appear from the back of the residence. Garrett said the man looked at him and then took off running. Garrett then got out of his car and went behind the house. Later, the man, identified as Tryon, approached Garrett. Garrett testified that Tryon told him he did not break into anything and that Garrett could look at anything he wanted. Garrett also testified that, while in the backyard, he saw, in plain view through an open door, tools in a shed on Tryon's property. After the air compressor and other tools were discovered, Tryon was placed under arrest. Bobbitt, the parole officer, was contacted; she came to Tryon's residence and conducted a search of his truck and residence. Bobbitt's search resulted in the seizure of methamphetamine and drug paraphernalia.

At the suppression hearing, Tryon argued that, based on Garrett's testimony, the air compressor was not in plain view because Garrett said that he had to go into the backyard to look inside the bed of the truck to verify what type of air compressor was located there. Tryon contended that Garrett's entry into the backyard constituted a search and that Garrett never informed Tryon that he had a right to refuse consent. Further, Tryon argued that, even if Bobbitt's search was authorized because he was on parole, the search would still be fruit of the poisonous tree because it was so linked in time to the initial illegal intrusion. The circuit

court concluded that the stolen items were in plain view. Further, the circuit court found that the search of Tryon's truck and residence, conducted by parole officer Bobbitt, was constitutional. Accordingly, the circuit court denied Tryon's motion to suppress evidence. One's dwelling and curtilage have consistently been held to be areas that may normally be considered free from government intrusion. *McDonald v. State*, 354 Ark. 216, 119 S.W.3d 41 (2003). Driveways and walkways used to approach a residence are portions of the curtilage as traditionally defined; however, the expectation of privacy in such areas is not generally considered reasonable. *Id.* Whether an area outside of one's home is private as opposed to public, for purposes of the Fourth Amendment, is not controlled by the common law of property. *Id.* Indeed, what a person knowingly exposes to the public is not a subject of Fourth Amendment protection. *Id.*

■■ Deputy Garrett testified that he could see Tryon's truck, with an air compressor in the truck bed, from the road. He made these observations from a lawful vantage point. Tryon had no reasonable expectation of privacy in the road leading to his residence, nor did he have a reasonable expectation of privacy in his driveway. Deputy Garrett's observation of the truck and air compressor did not amount to a search because those items were in plain view. Consequently, there was no violation of the Fourth Amendment, nor was there a violation of Article 2, § 15 of the Arkansas Constitution. Further, Deputy Garrett did not violate Tryon's constitutional rights by merely walking into the backyard after he saw Tryon take off running. *See, e.g., Vidos v. State*, 367 Ark. 296, 312, 239 S.W.3d 467, 479 (2006) (concluding that a police officer did not violate appellant's Fourth Amendment right to be free from searches and seizures when, after knocking at the residence and discovering that no one was home, he walked around the house to see if someone was in the backyard). In addition, Deputy Garrett's actions do not invoke the protections of Article 2, § 15 of the Arkansas Constitution. While in the backyard, Deputy Garrett observed, in plain view through an open door, tools in Tryon's shed. In this case, it is clear that the circuit court found credible testimony that the truck, air compressor, and tools were in plain view. We defer to the superior position of the trial court to pass upon the credibility of witnesses. *See, e.g., Holsombach v. State*, 368 Ark. 415, 246 S.W.3d 871 (2007).

Our determination that Deputy Garrett did not conduct a search because the evidence at issue was in plain view makes it unnecessary to address Tryon's claim that evidence seized by parole officer Bobbitt should have been suppressed as fruits of an illegal search. Bobbitt, who searched the interior of the truck and inside Tryon's house, conducted a warrantless parole search. Tryon does not contest the advance-consent terms to his release.

As a parolee, Tryon was required to sign and initial a Conditions of Release form. Among the terms to which Tryon was required to consent was the following provision:

> *Search and Seizure.* You must submit your person, place of residence, and motor vehicles to search and seizure at any time, day or night, with or without a search warrant, whenever requested to do so by any Department of Community Punishment officer.

The record reveals that Tryon signed and initialed the form upon his parole.

The United States Supreme Court has held that parolees are subject to suspicionless, warrantless searches at any time. *See Samson v. California*, 547 U.S. 843 (2006) (holding that suspicionless searches permitted by consent conditions of California parolees do not violate the Fourth Amendment). This court has recognized that "[t]he special needs of the parole process call for intensive supervision of the parolee making the warrant requirement impractical." *Cherry v. State*, 302 Ark. 462, 467, 791 S.W.2d 354, 357 (1990). When the consent to the terms of release is valid, the only remaining question is whether the search was carried out under those terms. *Id.* at 467, 791 S.W.2d at 357. In this case, Tryon does not argue that the searches conducted by Bobbitt were carried out in violation of the terms of his release. The evidence seized prior to Bobbitt's arrival was in plain view, and the evidence seized by Bobbitt resulted from a valid search of a parolee. We hold that the circuit court did not err in denying Tryon's motion to suppress.

### Motion to Suppress Custodial Statement

Tryon argues that the circuit court erred in denying his motion to suppress his custodial statement as "fruit of the poisonous tree" because it was obtained as a result of the primary illegal search without a warrant or valid consent. In his motion to

suppress statement, Tryon argued that his statement was given in violation of the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution. He did not raise his fruit-of-the-poisonous-tree argument in his motion. After a suppression hearing, the circuit court denied Tryon's motion to suppress statement. The State argues that Tryon's argument is not preserved for review because the circuit court did not rule on, or apparently even consider, the claim that Tryon now makes on appeal — that his statements were fruit of an illegal search under the Fourth Amendment. We agree. It is well settled that an appellant must raise and make an argument at trial in order to preserve it on appeal. *See, e.g., Raymond v. State*, 354 Ark. 157, 118 S.W.3d 567 (2003). This is true even when the issue raised is constitutional in nature. *See id.* If a particular theory was not presented at trial, the theory will not be reached on appeal. *See id.*

We add that, because we have concluded that there was no illegal search, there is no merit to Tryon's argument that his custodial statement should be suppressed as fruit of an illegal search. This court has noted that, where the tree is not "poisonous," neither is the fruit. *See Langford v. State*, 332 Ark. 54, 65, 962 S.W.2d 358, 364 (1998).

### *Closing Argument*

Tryon argues that the circuit court erred in denying his motion for mistrial or refusing to offer a curative instruction to the jury when the prosecutor made improper closing arguments during sentencing that included references to matters that were not in evidence and matters that inflamed the passions of the jury. Tryon's counsel objected to several remarks made by the deputy prosecuting attorney during sentencing. Following are the remarks at issue, as well as a colloquy between the circuit court, defense counsel, and the deputy prosecuting attorney:

> DEPUTY PROSECUTING ATTORNEY: I want to talk you to you also about one of your Instructions. On the possession of meth with intent, you're told that the sentence is ten to life in prison. I want you to know that it's your decision on that. You can sentence the Defendant to any number of years, anywhere from ten up to life and that can be thirty, forty, fifty, seventy, eighty. I just want you to be aware of that and consider that. There are several reasons to give a person consideration

on sentencing, but I don't know that this Defendant is deserving of that. You read his statement and it is on the statement to Brandon McCaslin of the Sheriff's Office, he told him he was not employed but he basically made his living by being a career criminal stealing from other people.

It is not just stealing that I want you to take into consideration. It's the violation of a person's safety and their feeling of well being in their own home. It's inconvenient to this victim, to Mr. Wofford, who had to take time off work the day this happened. He and his wife both, they had to leave work. They had to go home. They had to go in and take their own time to talk to the Sheriff's Office and give a statement about what happened. Mr. Wofford had to take off from work yesterday and he had to take off work again today to come to Court. He's not paid to be here to give his time and to give his testimony.

So, I ask you, how many crimes does this Defendant have to commit before he is sent off for the maximum amount of time allowed by law? Is eleven not enough in this case? I urge you to give this Defendant the maximum amount of time on each charge that you've convicted him of and I also urge you to recommend that his sentences be run consecutive.

I will also let you know that in my years as a Prosecutor and in my career as a Prosecutor, I have never stood before a Jury and I have never asked —

DEFENSE COUNSEL: Your Honor, we would object.

THE COURT: Overruled. I'm going to permit the argument.

DEPUTY PROSECUTING ATTORNEY: Okay. As I was saying, I have never stood before a Jury and I have never asked a Jury to sentence a Defendant to the maximum time and I have never asked the Jury to run a sentence consecutively; but I truly feel that in this case, that sentence is warranted. I've never seen a person with such a total disregard for —

DEFENSE COUNSEL: Your Honor, may we approach?

THE COURT: Sure.

DEFENSE COUNSEL: I am going to object and, Your Honor, we would ask for a mistrial and if the Court doesn't grant a mistrial, then probably we would ask the Court to tell the Jury to disregard the last statement.

THE COURT: State your specific objections.

DEFENSE COUNSEL: Because Ms. Houston, she said she had never seen a Defendant with a total disregard for these things that would be erroneous because we could have some people that she's seen that could be worse.

DEPUTY PROSECUTING ATTORNEY: Your Honor, that's just argument.

THE COURT: I am going to deny your motion for mistrial and I'm not going to instruct the Jury, but your exceptions are certainly — you're on the record.

DEFENSE COUNSEL: Thank you, Your Honor.

THE COURT: Go ahead.

DEPUTY PROSECUTING ATTORNEY: So I can go ahead with that?

THE COURT: Yes.

DEPUTY PROSECUTING ATTORNEY: As I was saying, the reason why I said, that is, that the statute in this case is warranted and with this Defendant, that particular sentence is warranted and, as I said, I have never seen a person with a total disregard for the law as Ronald Tryon. And we thank you very much for your deliberations.

Specifically, Tryon objects to the deputy prosecuting attorney's remark that she never saw a defendant with such disregard for the law and that she felt Tryon deserved the maximum sentence

available under the law. Tryon also objects to counsel's statement that he told Brandon McCaslin that he made his living by being a career criminal stealing from other people.

We have stated many times that the trial court is given broad discretion to control counsel in closing arguments, and we do not interfere with that discretion absent a manifest abuse of discretion. *Leaks v. State*, 339 Ark. 348, 5 S.W.3d 448 (1999); *Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998); *Lee v. State*, 326 Ark. 529, 932 S.W.2d 756 (1996). Closing remarks that require reversal are rare and require an appeal to the jurors' passions. *Leaks, supra; Lee, supra.* Furthermore, the trial court is in the best position to evaluate the potential for prejudice based on the prosecutor's remarks. *Leaks, supra; Noel, supra.*

Closing arguments must be confined to questions in issue, the evidence introduced during trial, and all reasonable inferences and deductions which can be drawn therefrom. *Leaks, supra.* It is the trial court's duty to maintain control of the trial and to prohibit counsel from making improper arguments. *Id.*

The decision to grant or deny a motion for mistrial is within the sound discretion of the trial court and will not be overturned absent a showing of abuse or manifest prejudice to the appellant. *Johnson v. State*, 366 Ark. 8, 233 S.W.3d 123 (2006). A mistrial is a drastic remedy and should only be declared when there is error so prejudicial that justice cannot be served by continuing the trial, and when it cannot be cured by an instruction to the jury. *See Holsombach, supra.* We have also stated that an argument is not objectionable merely because it expresses an opinion. *See, e.g., Neff v. State*, 287 Ark. 88, 696 S.W.2d 736 (1985).

The State argues that the prosecutor's statement of opinion that she had never "seen a person with a total disregard for the law" is not reversible error. Further, the State argues that, to the extent the prosecutor's opinion encapsulated a sentencing recommendation, it was proper as a permissible call for the jury to enforce the law.

■ This court has affirmed rulings allowing prosecutors to convey "send a message" themes during closing arguments. *See, e.g., Lee, supra; Muldrew v. State*, 331 Ark. 519, 963 S.W.2d 580 (1998); *Love v. State*, 324 Ark. 526, 922 S.W.2d 701 (1996); *Hill v. State*, 253 Ark. 512, 487 S.W.2d 624 (1972). Further, we have stated that it is not improper for the State's attorney to argue for the maximum punishment. *See, e.g., Holloway v. State*, 268 Ark. 24,

594 S.W.2d 2 (1980); *House v. State*, 192 Ark. 476, 92 S.W.2d 868 (1936). While the circuit court did not provide a curative instruction to the jury, the court had, of course, already instructed the jury that closing arguments were not evidence. The circuit court did not abuse its discretion in denying Tryon's motion for mistrial or in failing to admonish the jury upon Tryon's objection.

We do not reach Tryon's argument that it was improper for the deputy prosecuting attorney to state that Tryon had told Brandon McCaslin that he made his living by being a career criminal stealing from other people. Tryon did not make this argument below; thus, it is not preserved for appellate review.

### 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Tryon, and no prejudicial error has been found.

Affirmed.