2010 Ark. App. 596

**Billy R. WASHINGTON, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 10–30.**

Court of Appeals of Arkansas.

Sept. 15, 2010.

Alvin Schay, Little Rock, AR, for appellant.

Dustin McDaniel, Atty. Gen., LeaAnn J. Irvin, Asst. Atty. Gen., Little Rock, AR, for appellee.

RITA W. GRUBER, Judge.

Billy R. Washington was arrested for possession of cocaine with intent to distribute on October 27, 2008, during a police investigation of a road-rage incident at a Hot Springs gas station. He was convicted in a jury trial and was sentenced to twenty years' imprisonment. He appeals the conviction, contending that the circuit court erred 1) by failing to grant his motion for a directed verdict; 2) by denying his request to present a particular witness in his defense; and 3) by allowing drug evidence over his chain-of-custody objection. We affirm.

The State's witnesses included Corporal Sonya Luzader of the Hot Springs Police Department, Chris Chapmond of the Hot Springs Police Department and the 18th East Drug Task Force, and chemist Nick Dawson of the state crime laboratory. Witnesses for the defense included Tammy Williams, Corporal Paul Calcagno, and Washington.

Luzader testified to the pertinent events of October 27, 2008, which began while she was having lunch at a Mc-Donald's and diners said there was about to be a fight across the street. Luzader observed a man in a car, flailing his arms and pointing at another motorist. She drove across Central Avenue and made contact with Washington as he walked from a Valero station to the car, which had parked at a gas pump. He insisted to her that there was no problem, but she ran his name through dispatch and learned that there was a valid warrant against him. She told him she was taking him into custody.

Luzader told Corporal Calcagno, who had arrived as her backup, to watch Washington while she waited for confirmation of the warrant. Washington was near the rear of his car when the return from dispatch came, "kind of meandering, pacing, nervous," as if "he didn't want to deal with the police that day." When Luzader attempted to see what was inside Washington's car, he turned and meandered toward a trash can.

Luzader further testified:

He turned to the right and I saw a glimpse of something in his hand coming from the area of his waist ... and he did kind of a dumping swirl motion. I

couldn't tell what was in his hand when he made that motion, except [it] was something that was a light-colored object of some kind, and then I heard it fall in the trash ... like dropping a few papers in the trash can. I screamed Calcagno's first name, ... and he went and took hold of Washington. I flew around the front of the car.... And sure enough in the trash can when I looked in there, I knew there was going to be something in there that he shouldn't have had, and sure enough it just happened to be crack cocaine.

Luzader told Washington she had seen him drop the object in the trash can. He argued with her, and Calcagno handcuffed him in a team effort.

During a search subsequent to Washington's arrest, a large amount of cash was found in Washington's pants pocket. Luzader transported him to the sheriff's office, and she notified the drug task force because of the large quantity of drugs and money in the case. Sergeant Chris Chapmond and another agent came in response.

Luzader identified State's Exhibit 1 as the cocaine she had found lying on top of other trash in the can. She stated that it was in substantially the same condition as when she had found it in a baggie and that it apparently had been packed in another bag by the drug task force. Under cross-examination she emphasized that she "saw everything" herself.

Corporal Calcagno testified that he followed Washington to the trash can when he threw away a cup. Washington moved faster than Calcagno expected, throwing the cup with his left hand and "hovering," his back turned and his right hand out of sight. Calcagno had no doubt that the cocaine was in the can before Luzader retrieved it.

Sergeant Chapmond identified Exhibit 1 by case number, labeling, and his own handwriting as the item Luzader had given him at the sheriff's office the same day. He testified that he "placed the plastic bag with the crack cocaine in the small envelope, and it was placed in this larger envelope" to be sent to the state crime lab for testing and weighing. He said that a property officer with the drug task force "delivers this to the crime lab, where it's turned over to a chemist." The cocaine's weight before being sent to the crime lab was 28 to 29 grams, which Chapmond said had a street value of $2800 to $3000 in Hot Springs.

Chapmond also received $2084 in $1, $20, and $100 bills that Luzader had taken from Washington. Chapmond testified that these denominations, particularly the twenties and hundreds, were common in street-level sales. Washington objected when Chapmond was asked what his training and experience showed him about finding cash of such denominations and quantity "in conjunction with suspected narcotics," arguing that he could not be asked about a person's "$100 and $20 bills, that's involving drugs." The objection was overruled. Chapmond reiterated that those denominations indicated narcotic sales within the community and that standard practice was to seize the money and place it in a secure account, not to test it for substances.

Nick Dawson testified that he tested Exhibit 1 at the state crime lab and that Exhibit 2 was his results sheet. He stated that the exhibits' case and agency numbers "matched up" and that the outside packaging, bearing his initials and the date he resealed it, matched the date and case number of the inner packaging. He was certain that Exhibit 1 was the substance he had tested, 28.2695 grams containing cocaine. The prosecutor moved to introduce Exhibits 1 and 2 into evidence, and Washington objected, arguing that the

State had not established "a chain—connection—from the time it [was] taken at arrest through the point that Dawson as the state chemist 'did it.'" The court sustained the objection, and the State asked the court to reconsider because the item was unique. Washington also objected that the State's failure to introduce the drug task force's property inventory form, which listed items Luzader took from Washington, showed that she "filed it off" to Chapmond and constituted a break in the chain of custody. The court overruled the objection, citing testimony that Luzader had given the evidence to Chapmond, who sent it to the crime lab after placing it in a bag and envelope.

Dawson explained that the drugs were submitted in the large outer envelope, State's Exhibit 4, which he had obtained from the evidence section; inside it was a smaller envelope, Exhibit 3; "inside that was the smaller of the two plastic bags ... that contain the drugs"; and that he had received the drugs and smaller plastic bag. Washington continued to raise chain-of-custody objections, alleging a break between Luzader and Chapmond. The court overruled Washington's continuing objections to the smaller and larger envelopes. Exhibits 1–4 were admitted into evidence.

Tammy Williams, the cashier and assistant manager of the Valero store, testified in the case for the defense that she saw the entire transaction involving Washington's arrest and said that Washington, with a glass of ice in one hand and canned soda and chips in the other, put nothing in the trash from the time he left the store until his arrest. She admitted that Washington's back was to her and she did not really know what went on in front of him.

At this point in the trial, Washington announced he was calling attorney Josh Hurst as a rebuttal witness. The State objected because Washington had not disclosed him as a witness. Washington replied that the testimony would rebut the State's inference that the $2084 was drug money and that the State had not qualified Chapmond as an expert. Washington asked that Hurst be allowed to testify that Washington was attempting to fight the money's confiscation and be allowed to identify an insurance-settlement check payable to Washington, which would reflect that the $2084 had nothing to do with drugs. He admitted he had known that Chapmond would be a witness, that there was a seizure and forfeiture, and that the State had to prove possession with intent to deliver.

The court ruled that Hurst was not a rebuttal witness and excluded his testimony because Washington had not disclosed him as a witness at the beginning of trial. Washington was allowed to proffer Hurst's testimony and the purported, handwritten insurance check in the amount of $4715.89. Washington said that Hurst's proffered testimony would be that Washington retained him to retrieve the seized $2084, that Hurst asked Washington to gather information explaining how he got the money, and that Hurst had a copy of the face of Southern Farm Bureau's check to Washington.

*Motion for Directed Verdict*

Washington's first point on appeal is that the evidence was insufficient to support the conviction. He points to his motions for a directed verdict at the close of the State's case and at the conclusion of all the evidence, which were denied by the trial court. The grounds of his first motion were that the State had not "met its chain of custody," the State had "not proven its case" because there was "no evidence or testimony of the charge ... as being crack cocaine," and the testimony of the State's witnesses "did not rise to the level of a

scintilla." Washington renewed the motion at the conclusion of all the evidence and asked the court "to revisit the issue of chain of command or chain of evidence . . . because there just simply is no evidence about the cocaine."

A motion for directed verdict is a challenge to the sufficiency of the evidence. *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007). A directed-verdict motion must clearly and specifically state an issue to the circuit court in order to preserve it for appeal. *Phillips v. State*, ₇361 Ark. 1, 203 S.W.3d 630 (2005); *Meadows v. State*, 358 Ark. 396, 191 S.W.3d 527 (2004). Here, as in *Phillips* and *Meadows*, Washington's motions for directed verdict did not clearly and specifically enunciate the proof that was missing regarding the criminal offense. Thus, his sufficiency issue is not preserved for appellate review.

### Rebuttal Witness

As his second point on appeal, Washington contends that the trial court erred by denying his request to present witness Josh Hurst as a rebuttal witness. The State objected to allowing this witness to testify. The trial court upheld the State's objection, ruling that the request came during the case-in-chief for the defense, not rebuttal or surrebuttal, and that Washington had not complied with discovery rules that he disclose the witness. He argues on appeal that the State had not advised him that Chapmond would be offered as an expert witness to conclude that large amounts of drugs and money found on a suspect signal drug trafficking.

Discovery in criminal cases is a two-way street that promotes fairness by allowing both sides opportunity for full pretrial preparation, preventing surprise at trial, and avoiding unnecessary delays during the trial. *Mitchell v. State*, 306 Ark. 464, 816 S.W.2d 566 (1991). Under Rule 18.3 of the Arkansas Rules of Criminal Procedure,

Subject to constitutional limitations, the prosecuting attorney shall, upon request, be informed as soon as practicable before trial of the nature of any defense which defense counsel intends to use at trial and the names and addresses of persons whom defense counsel intends to call as witnesses in support thereof.

₈Matters pertaining to the admissibility of evidence are left to the sound discretion of the circuit court. *McEwing v. State*, 366 Ark. 456, 237 S.W.3d 43 (2006). The appellate court will not reverse such a ruling absent an abuse of that discretion; nor will the court's ruling be reversed absent a showing of prejudice, as prejudice is not presumed. *Id.*

Here, the trial court excluded Hurst's testimony because Washington failed to comply with the rules of discovery. Washington was fully on notice of the need for testimony about money from his purported insurance settlement, and he offered no further reason for his failure to disclose Hurst as a witness. The trial court was well within its discretion to preclude Hurst from testifying.

### Chain of Custody

Washington's third point on appeal is that the trial court erred by allowing drug evidence over his chain-of-custody objection. The purpose of establishing a chain of custody is to prevent the introduction of evidence that is not authentic or that has been tampered with. *Guydon v. State*, 344 Ark. 251, 39 S.W.3d 767 (2001). To prove authenticity of evidence the State must demonstrate a reasonable probability that the evidence has not been altered in any significant manner. *Id.* It is not necessary that every moment from the time evidence comes into the possession of a law enforcement agency until it is intro-

duced at trial be accounted for by every person who could have conceivably come in contact with the evidence during that period. *Id.* Nor is it necessary that every possibility of tampering be eliminated; it is only necessary that the trial court in its discretion be satisfied that the evidence presented is genuine and, in reasonable probability, has not been tampered with. *Id.* Absent an abuse of discretion, a ruling on an evidentiary matter regarding the admissibility of evidence will not be reversed because such matters are left to the sound discretion of the trial court. *Id.*

 Minor uncertainties in the proof of chain of custody are matters to be argued by counsel and weighed by the jury, but they do not render the evidence inadmissible as a matter of law. *Green v. State,* 365 Ark. 478, 231 S.W.3d 638 (2006). Proof of chain of custody for interchangeable items like drugs or blood needs to be more conclusive than for other items of evidence. *Crisco v. State,* 328 Ark. 388, 943 S.W.2d 582 (1997). Nevertheless, the mere possibility of access to the item, where there is no evidence of tampering, is not enough to render test results inadmissible; the trial court is given a degree of discretion in such matters and its ruling will not be reversed absent an abuse of that discretion. *Green, supra.*

Corporal Luzader notified Sergeant Chapmond about the large amount of drugs and money recovered from Washington. Luzader identified State's Exhibit 1 at trial as the item she recovered from the trash can where she had seen Washington drop something. Sergeant Chapmond identified the same exhibit as the item he received from Luzader; he described its original packaging and the envelopes he used to send it to the state crime lab. Chemist Dawson identified Exhibit 1 as the object he received at the crime lab in connection with this case, Exhibit 2 as his lab report showing that the substance was cocaine, and Exhibits 3 and 4 as the inner and outer envelopes in which he received the item. Thus, the State established a chain of custody for the cocaine that Luzader received. The trial court did not abuse its discretion in allowing the evidence.

Affirmed.

HENRY and BAKER, JJ., agree.