Cite as 2020 Ark. App. 474

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CR-19-579

| | | |
|---|---|---|
| ALYSSIA KIRBY-SNOW | APPELLANT | **Opinion Delivered:** October 21, 2020 |
| V. | | APPEAL FROM THE BAXTER COUNTY CIRCUIT COURT [NO. 03CR-16-314] |
| STATE OF ARKANSAS | APPELLEE | HONORABLE GORDON WEBB, JUDGE |
| | | AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

Alyssia Kirby-Snow appeals her convictions of permitting the abuse of a minor, a Class B felony, and endangering the welfare of a minor in the first degree, a Class D felony.[1] She was sentenced to a total of twenty-six years' imprisonment. On appeal, Kirby-Snow challenges the sufficiency of the evidence alleging that the jury had to resort to speculation and conjecture. For the following reasons, we affirm.

Kirby-Snow's convictions arise from the abuse of her three-week-old infant, A.S., resulting in the child's broken clavicle, severe brain injuries, and seizures. Kirby-Snow's then boyfriend and later husband, Jonathan Snow, was also charged with battery in the first degree and endangering the welfare of a minor in the third degree. This court reversed and

---

[1]She was acquitted of battery in the first degree.

dismissed his battery conviction but affirmed the endangering-the-welfare-of-a-child conviction in *Snow v. State*, 2018 Ark. App. 612, 568 S.W.2d 290.

Kirby-Snow's three-day jury trial began on January 30, 2018. The following evidence was adduced at trial. On February 25, 2016, Mountain Home Police Department investigator Jay Volkman and Arkansas State Police special agent Becky Vacco interviewed twenty-nine-year-old Kirby-Snow and eighteen-year-old Jonathan Snow at the apartment home where the two lived with A.S. and two of Kirby-Snow's three other children. Kirby-Snow told the investigators that she was still trying to figure out what happened to A.S. because when she looked up his symptoms online, they all seemed to be normal newborn behaviors. Kirby-Snow told them that she saw A.S. have an "episode" for the first time on Saturday, February 20 between four and five in the evening. She said that at the time, she did not know that these "little fits" he was having were seizures, and she thought that when she took him to the doctor on Monday, the worst-case scenario was that he would be diagnosed with jaundice.

Kirby-Snow described A.S.'s fits as his stiffening out his body, putting his hands up, and shaking, or he would grab and pinch his face. She attributed his bruises to his pinching his face, and she said she literally had to pry back his little fingers. She also said that the scratches on his face and chest occurred because his nails were long. She told investigators that A.S. was bruised on the temple on Friday, February 19 when the seatbelt on the car seat hit him in the head. She had no explanation for A.S.'s broken clavicle, though she said sometimes one of the children would carry him and might have dropped him.

2

Kirby-Snow told Vacco that she and Snow began to get concerned about A.S. Saturday evening into Sunday. She told Volkman that she waited to take A.S. for medical care on Monday, February 22 because she called the emergency room Sunday night and the recording said to call back during business hours or to call an ambulance if there was an emergency.

Dr. Michael Adkins, A.S.'s pediatrician, had treated A.S. since his birth on January 27, 2016. He saw A.S. for an office visit on February 4 and found A.S. to be well with no acute issues on that date, though he was mildly jaundiced. On Monday, February 22, Kirby-Snow made an appointment with Dr. Adkins for one o'clock. At the appointment, Kirby-Snow told the doctor that she was only concerned about jaundice and that A.S. had not eaten in the past two days. A.S. was not jaundiced, but he exhibited many signs of life-threatening injury, including a broken collarbone and significant bruises, and he was having a seizure.

Dr. Adkins sent A.S. to the local emergency room for treatment and called the Arkansas Department of Human Services (DHS) regarding suspected child abuse. When Dr. Adkins told Kirby-Snow that he was notifying DHS, she simply responded, "Okay." When he asked her to explain the bruises, she told him the child had been hit with a seatbelt when he was being put into the car. He asked Kirby-Snow why she did not seek medical help sooner, and she said, "I don't know."

Amber Sanders, a registered nurse in Dr. Adkins's office, testified that Kirby-Snow normally was kind of bubbly and talkative about life in general but that she did not say much

at the visit on February 22, and she did not make a lot of eye contact. When asked to explain the bruising on his face, Kirby-Snow said A.S. had pinched himself.

A.S. was seen at the local hospital emergency room that evening and then airlifted to Arkansas Children's Hospital (ACH) that night. Dr. Karen Farst, a pediatrician board certified in general pediatrics and child-abuse pediatrics, testified that she began treating him when he arrived at ACH. A.S. was in critical condition, breathing only with the help of a ventilator because of his head injury and the sedating seizure medication he had been given, and he was not responsive to his environment. He had quite a bit of swelling of his brain that was pushing down on his brainstem. He had bruises, and several leads and monitors were attached to his body. He was at risk of death and was on life support.

A.S. was connected to an EEG to monitor for seizure activity. He had a tube running into his stomach to draw off air and gastric juices so that he would not burp those up into his lungs while he was on the ventilator. He had a prominent bruise that protruded a bit on the right side of his forehead. His eyes were a little puffy, and his left eye had quite a bit of red bruising around it. He had abnormal brainwave activity, indicating swelling, bleeding, and abnormal seizure activity.

Dr. Farst testified that swelling of the brain could be caused by direct trauma, such as "pretty bad blows," a violent shaking injury, or other things that would deprive the brain of oxygen and blood flow, such as if the heart stops beating or breathing stops. A.S. also had bruising around his left nipple and red bruising in a little more of a linear pattern that went down his left chest wall and onto the left side of his abdomen. Dr. Farst could not tell if the

4

bruises all occurred at the same time or at different times. A.S. also had a broken collarbone on his right side.

Dr. Farst testified that it is very uncommon for an infant to have a bone break because infant bones are more pliable, bending before they break, and because infants are not active enough to cause fractures. She also was sure that the fracture did not occur during birth because the break was too fresh and showed no sign of any healing. A.S. was underweight, especially compared to his birth weight. He had a curved bruise and abrasion under his right jawline.

Dr. Farst testified that it was not possible for A.S. to have inflicted this injury upon himself by pinching his skin and that the injury was much bigger than a fingernail scratch from a baby would be. A.S. had a couple of other injuries in his neck area. Dr. Farst said that A.S. would have died if he had not received medical care. The injuries he had could not be self-inflicted or obtained by him moving about by himself. The injuries were "not anything that would even just happen from routine handling if you dropped the baby or if they were to scootch off the couch. These [were] really unusual and—and just the whole constellation of injury was a very high force injury[.]"

Dr. Farst diagnosed the injuries as child abuse by a larger person, not by a five-year-old or a three-year-old picking A.S. up and dropping him on the floor. She also said he suffered secondary trauma from having seizures for such an extended period of time without receiving medical care. Dr. Farst said that if A.S. had been taken to the emergency room when he had the first seizure, his outcome likely would not have been as severe because a lot of his brain injury was a result of swelling. She also said that A.S. did not suffer from

5

jaundice. A.S. remained hospitalized for six weeks, and Dr. Farst explained at length the serious permanent repercussions of his injuries.

Snow's cellphone contained videos of A.S. having a seizure and his condition deteriorating. The videos, recorded in the early morning hours of February 22, were played for the jury. The videos were narrated by Snow, who was with A.S. and who gave an account of A.S.'s activity over the prior three hours. In the videos, Snow described the child's alarming behavior, including hyperventilating at times, having spells of stiffening his body, throwing up his food, seeming to be congested, having a respiratory problem, passing in and out of consciousness despite having slept all day, and refusing to suck on his pacifier.

Snow said that the child's behavior was "freaking [him] out." He also referred to the child as "freaking out" when he had a fit and described his behavior as "crazy." At one point, he said he tried to awaken Kirby-Snow to show her the video, but she was passed out. He also stated that the seizures were happening closer together.

Dr. Farst testified that the videos found on Snow's phone showed abnormal eye movements and body movements characteristic of a seizure. The videos showed A.S.'s hands clenched so tightly that an adult could not unclench them, another characteristic of seizure activity.

Joseph Elders, a friend of both Snow and Kirby-Snow, testified that he had visited their home sometime during the weekend of February 12–14, 2016, to meet A.S. for the first time. When he saw A.S., his eyes were moving side to side rapidly and he looked like he was having an epileptic seizure. He told Kirby-Snow that he thought A.S. was having a

seizure, but she told him that most newborn's eyes moved like that when they were adjusting to light.

The Baxter County jury acquitted Kirby-Snow on the first-degree-battery charge but convicted her of permitting the abuse of a minor and endangering the welfare of a minor. This appeal challenging the sufficiency of the evidence is now properly before us.

When considering a challenge to the sufficiency of the evidence on appeal, our court views the proof in the light most favorable to the State, considering only the evidence that supports the verdict. *E.g.*, *Noble v. State*, 2017 Ark. 142, at 2, 516 S.W.3d 727, 729. We affirm if there is substantial evidence to support the conviction. *E.g.*, *id.* Substantial evidence is that which is of sufficient force and character to compel a conclusion beyond speculation or conjecture. *E.g.*, *id.* Circumstantial evidence may constitute substantial evidence to support a conviction. *E.g.*, *Brunson v State*, 368 Ark. 313, 316, 245 S.W.3d 132, 136 (2006). Circumstantial evidence provides a basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *E.g.*, *Howard v. State*, 358 Ark. 471, 484, 79 S.W.3d 273, 281 (2002). Whether the evidence does so is a question of fact for the jury to determine. *Id.*

The fact-finder determines the weight of the evidence and the credibility of the witnesses; the appellate court does not second-guess the fact-finder. *E.g.*, *Tryon v. State*, 371 Ark. 25, 32, 263 S.W.3d 475, 481 (2007). "The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's." *Id.* at 32, 263 S.W.3d at 481–82. "[A] jury need not lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's

guilt from improbable explanations of incriminating conduct." *Holt v. State*, 2009 Ark. 482, at 5, 348 S.W.3d 562, 566.

Arkansas Code Annotated section 5-27-221(a) defines permitting abuse of a minor as follows: "A person commits the offense of permitting abuse of a minor if, being a parent . . . , [she] recklessly fails to take action to prevent the abuse of a minor." Ark. Code Ann. § 5-27-221(a) (Repl. 2013). A "minor" is a person under eighteen, and "abuse" means "sexual intercourse, deviate sexual activity, sexual contact, or causing physical injury, serious physical injury, or death, which could be prosecuted as a delinquent or criminal act[.]" Ark. Code Ann. § 5-27-221(d).

"A person acts recklessly with respect to attendant circumstances or as a result of [her] conduct when the person consciously disregards a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur." Ark. Code Ann. § 5-2-202(3)(A) (Repl. 2013). "The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation[.]" Ark. Code Ann. § 5-2-202(3)(B). Criminal intent can be inferred from one's behavior under the circumstances, and it is presumed that one intends the natural and probable consequences of one's acts. *E.g.*, *Harmon v. State*, 340 Ark. 18, 26, 8 S.W.3d 472, 477 (2000). The fact-finder "may draw upon common knowledge and experience to infer the defendant's intent from the circumstances." *Id.* at 27, 8 S.W.3d at 477.

Clearly, there was substantial evidence to support the conviction for permitting abuse of a minor. A.S. was a normal and healthy baby on February 4, 2016, with only a mild case of jaundice. As early as February 12–14, 2016, he appeared to a family friend to be having

a seizure, but when the friend told Kirby-Snow that A.S. was having a seizure, she brushed it off as normal newborn behavior. The State argues that Kirby-Snow had given birth to three other children prior to A.S. and had been a mother for ten years, so it was reasonable for the jury to conclude that she should have known the difference between normal and abnormal newborn behavior. We agree.

Kirby-Snow claimed that a seatbelt hit A.S. in the head on Friday, February 19, 2016, causing the prominent injury to his forehead. However, Dr. Farst testified that A.S.'s injuries resulted from child abuse. Kirby-Snow told investigators that A.S. began to have his "little fits" on the afternoon of Saturday, February 20, and she apparently knew his condition was such that she needed to get him medical attention because she called the hospital Sunday night around midnight. Despite recognizing that A.S. needed medical attention, she nonetheless claimed that she did not take him to the emergency room because she got a recording and feared the staff would think she was overreacting.

We are not persuaded by Kirby-Snow's argument that her conviction for permitting the abuse of a minor is not supported by substantial evidence because Jonathan Snow's first-degree-battery conviction was reversed and dismissed on appeal for insufficient evidence. She contends that "[t]here is no additional or different testimony herein that would or could sustain" her conviction "in light of this Court's findings and holdings in [*Snow*.]" This argument does not entitle Kirby-Snow to any relief.

First, the argument is not preserved for appeal, as it was not made below. *See, e.g.*, *London v. State*, 354 Ark. 313, 320, 125 S.W.3d 813, 817 (2003) (issues raised for the first time on appeal, even constitutional ones, will not be considered because the trial court never

9

had an opportunity to rule on them). Second, the fact that Snow's battery conviction was reversed and dismissed does not mean that Kirby-Snow's permitting-abuse conviction is unsupported by the evidence. "In any prosecution for an offense in which the liability of the defendant is based on conduct of another person, it is no defense that . . . [t]he other person has not been charged with, prosecuted for, convicted of, or has been acquitted of any offense or has been convicted of a different offense or degree of offense, based upon the conduct in question[.]" Ark. Code Ann. § 5-2-405(2) (Repl. 2013). Our supreme court has held that an appellate court's dismissal of a conviction due to insufficiency of the evidence is tantamount to an acquittal for purposes of this statute. *Roleson v. State*, 277 Ark. 148, 150, 153, 640 S.W.2d 113, 114, 115 (1982).

Kirby-Snow also argues that there is no evidence that she purposely engaged in conduct creating a substantial risk of death or serious physical injury to A.S. A person commits first-degree endangering the welfare of a minor "if, being a parent, . . . [she] purposely [e]ngages in conduct creating a substantial risk of death or serious physical injury to a minor." Ark. Code Ann. § 5-27-205(a) (Repl. 2013). "A person acts purposely with respect to [her] conduct or a result of [her] conduct when it is [her] conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1). The term "conduct" is defined as "an act or omission and its accompanying mental state." Ark. Code Ann. § 5-2-201(3).

Kirby-Snow argues that there is no evidence that she knew of the serious concerns for A.S.'s health until the morning of February 22, 2016, when she first saw the videos made earlier that morning of A.S. having a seizure. However, the evidence shows that a family

10

friend told Kirby-Snow that A.S. was having a seizure as early as February 13, that she thought he had received a blow to the head resulting in a serious bump on his forehead on Friday, February 19, and that she told investigators that he was having "fits" as early as Saturday evening, February 20. She thought his injuries were serious enough to call the hospital twice late Sunday night, February 21, but she did not take him to the emergency room at that time.

Instead, Kirby-Snow "passed out" and left A.S. in the care of his eighteen-year-old, first-time father, who could not rouse her to help him care for A.S, who was obviously very ill. Then, even after seeing the disturbing videos of A.S. taken early Monday morning, Kirby-Snow failed to take A.S. to the emergency room. Instead, she did not get proper medical care for A.S. until the one o'clock appointment on February 22. Dr. Farst testified that the failure to seek immediate medical care for A.S. exacerbated his injuries, so Kirby-Snow's conduct not only placed A.S. at a substantial risk but also caused significant further injury resulting in permanent brain damage.

Viewed in the light most favorable to the State, the testimony established substantial evidence to support Kirby-Snow's convictions. Accordingly, we affirm.

Affirmed.

SWITZER and BROWN, JJ., agree.

*Hancock Law Firm*, by: *Charles D. Hancock*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.