Talideen Tramal DAVENPORT *v.* STATE of Arkansas

CR 07-1086                                            281 S.W.3d 268

Supreme Court of Arkansas
Opinion delivered March 20, 2008

---

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Laura Shue*, Ass't Att'y Gen., for appellee.

PAUL E. DANIELSON, Justice. Appellant Talideen Tramal Davenport appeals from his convictions for capital murder and three counts of unlawful discharge of a firearm from a vehicle and his sentence to life imprisonment without parole plus fifteen years. His sole point on appeal is that the circuit court erred in denying his motions for directed verdict. We affirm Davenport's convictions and sentence.

A review of the record reveals that on October 2, 2005, four teenagers, T.N., L.R., J.R., and J.S., stopped for gas at a gas station in Little Rock. While the driver, T.N., was pumping gas, a blue Jeep Cherokee pulled next to the teens' car. Comments were exchanged between the occupants of the two vehicles, and a gun was fired, killing L.R. Davenport was arrested and, ultimately, was convicted of capital murder and three counts of unlawful discharge of a firearm from a vehicle and was sentenced as already set forth.

Davenport argues that the circuit court erred in denying his motions for directed verdict because the State did not provide substantial evidence that Davenport himself discharged a firearm from a vehicle and committed murder. He asserts that the only evidence presented at trial that he was the shooter was the testimony of T.N., J.R., and J.S. He contends that their in-court identifications of him were so unreliable and clearly unbelievable that this court should ignore them and overturn his conviction.

The State responds that substantial evidence supported Davenport's identity as the shooter. It contends that viewing the evidence in the light most favorable to it, the facts were of sufficient force and character to compel a conclusion beyond suspicion or conjecture that Davenport was the shooter. It further submits that to the extent that Davenport challenges the reliability of the identifications, that was for the jury to decide, as Davenport

did not argue to the circuit court that the in-court identifications were constitutionally infirm, nor did he object or move to suppress the identifications, waiving any issue relating to any alleged defects.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *See Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007). When reviewing the sufficiency of the evidence, we determine whether there is substantial evidence to support the verdict, viewing the evidence in a light most favorable to the State. *See id.* Substantial evidence is that which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *See id.*

Here, Davenport does not challenge the State's proof on any of the elements of the offenses charged against him, but instead urges that his motions for directed verdict should have been granted due to the fact that the witnesses' in-court identifications of him were so unreliable and unbelievable. We have held that the credibility of witnesses is a matter for the jury's consideration. *See Boyd v. State*, 369 Ark. 259, 253 S.W.3d 456 (2007). Where the testimony is conflicting, we do not pass upon the credibility of the witnesses and have no right to disregard the testimony of any witness after the jury has given it full credence, where it cannot be said with assurance that it was inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon. *See Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975).

Here, T.N. identified Davenport, at trial, as being the one that he saw with the gun on the evening in question. He stated that he was positive that Davenport was the one and that, at the time, Davenport was partially in the Jeep Cherokee:

> PROSECUTOR: How certain are you of that?
>
> T.N.: Positive, because I seen him, he opened the door, he stepped on — he was inside the door [of the Jeep Cherokee], he stepped on a little ledge right there. He was pointing the gun over on the Jeep.
>
> PROSECUTOR: Let me ask you this, was he — was his body all still in the car?
>
> T.N.: Like half. His legs — his leg was in the car.

PROSECUTOR: His legs were in the car?

T.N.: Upper body was above.

PROSECUTOR: How did he get out and shoot?

T.N.: He got up, stepped up over there, leaned over the car like this and shot.

T.N. testified that as he drove off, J.S. jumped out of the car and ran the other way. T.N. testified that the other vehicle chased after J.S., shooting at him. He testified that L.R. had fallen into his lap and that he thought she had been shot.

T.N. testified that while he made an identification from a photo spread shown to him by police, he "wasn't sure it was the person." He then confirmed that, when he saw Davenport in the courtroom that day, he knew Davenport was "the guy" "because I felt and I seen his face and I remember his face because I had — when she told me it was a gun, he had a gun, I had looked up and looked him dead in his eyes and I seen him." T.N. further stated that Davenport looked as if he had lost a "little weight" since the night in question, that his face was "still the same," and that he had a "lot more hair on his head." On cross-examination, T.N. testified that he recognized Davenport "when I walked in the door [of the courtroom]" and that he was "positive" that it was him. On redirect, he testified that it was not possible that he could be mistaken as to Davenport being the shooter because he remembered his face and was never going to forget it.

J.R. also testified that the shooter stood on a "little rail or something" of the Jeep Cherokee "up in the truck" and pointed his gun. She testified that when he started shooting, they "all held our head down." She admitted that two weeks after going to the police station, she could not pick anyone out of a photo spread presented to her by the police. She then stated that she recognized the shooter when she came to court on that day:

PROSECUTOR: You thought you were just — let me back up. You thought you were going to introduce yourself to the ladies and gentlemen of the jury. You didn't think anyone was going to be in here at that time?

J.R.: No, ma'am, I didn't think so.

PROSECUTOR: Okay. All right.

J.R.: And so when I came in, and then I — and then I looked that way and I saw when he bit his lip and that made me think about when he was shooting the gun, he was biting his lip.

PROSECUTOR: Okay.

J.R.: And so that made me think about it and it flashed back.

PROSECUTOR: Who are you talking about?

J.R.: The shooter.

PROSECUTOR: Who is that? Who is it?

J.R.: Him right there.

PROSECUTOR: Where is he sitting?

J.R.: (Witness pointing.)

PROSECUTOR: Okay. All right. Let me ask you something. Are you pointing to him just because he's black?

J.R.: No.

PROSECUTOR: Are you sure?

J.R.: Yes. Yes, ma'am.

PROSECUTOR: Are you pointing to him because you feel like you're under pressure? And I want you to be honest with these people.

J.R.: No. I actually, I just I remember [sic] this part right here. I remember like his nose and from him biting his lip. And when he bit his lip as I walked in[to the courtroom], that made me think about it.

PROSECUTOR: And you say he was biting his lip as he was shooting?

J.R.: And it flashed back. Yes, ma'am.

PROSECUTOR: You remember?

J.R.: Yes, ma'am, he was biting his lip when he was shooting.

On cross-examination, J.R. confirmed that she told police that as soon as she saw the gun, she "ducked [her] head."

Finally, J.S. testified that the shooter "hung out of the car and started shooting." He testified that he had "peeped" at the shooter's face, seen him, and took off running. He testified that a few weeks after the shooting, he returned to the police station to look at some pictures, but could not pick the shooter out of them. He testified that the next time he saw the shooter, other than the night of the shooting, was when he came for a hearing with L.R.'s mother, his godmother. He stated that a "whole bunch of inmates" were on one row with people on both sides and that when he walked in, "it just hit [him] all over again like he was right there shooting[.]" J.S. testified that after he left the courtroom that day, he did not see the shooter again. He then identified Davenport as the shooter. He stated that he was "a hundred percent" certain that Davenport was the person who shot at the teens' car. He then testified that he was never going to forget the face that was shooting at him and killed his godsister.

In addition to the three teens' testimony set forth above, further evidence was presented that pointed to Davenport as the shooter. A.H. testified that she was at the gas station at the time of the shooting, having arrived in a separate car from that of the teens' or Davenport. She testified that while walking toward the gas station to use the restroom, she overheard "words," then saw the gun, and began running back towards her car. She admitted knowing Davenport as "Fat Boy." She further admitted that in her statement to police, she acknowledged that "Fat Boy" also went by the name of "Todd." She admitted that she picked him out of a photo spread presented to her by the police. At the time of trial, however, she said that she did not know if Davenport was the shooter and that she did not see his face. She did, nonetheless, admit that she told the police that he was the person shooting at the car:

PROSECUTOR: Is he the person that was shooting at that car?

A.H.: I don't — I don't know.

PROSECUTOR: I don't know.

A.H.: I didn't see his face.

PROSECUTOR: Okay. Did you — would you agree with me that you told the police that he was?

A.H.: Yes.

PROSECUTOR: You did tell the police —

A.H.: Yes, I did.

PROSECUTOR: — that he was the person?

A.H.: I told them that, yes, that day.

A.H. then testified that she lied to police because she felt pressured to do so.

Joseph Ramey also testified. He testified that he was currently incarcerated in the Arkansas Department of Correction (ADC) for a sentence of sixty years. He acknowledged that he approached the prosecutor about Davenport and that, in exchange for Ramey's testimony, the prosecutor would send a letter to the parole board or the judge informing them about his cooperation in the case and would send a letter to ADC asking it to keep him housed at a certain unit. He testified that, while housed with Davenport at the county jail, Davenport told Ramey that he needed to lose weight so he would not "look like Fat Boy." He further testified that Davenport gave his food away every day and that Davenport showed him the police files in his case, which Davenport had acquired through discovery.

Ramey testified that Davenport showed him in the police files where A.H. initially told police that she thought Davenport was the shooter and where she later stated that "it was definitely him." He stated that Davenport told him that "[h]e was trying to come up with a way to get her to change her story to say that she was drunk when she made the statement." He further stated that Davenport told him that "he had sent an affidavit to his brother and for her to fill out and send back, telling her what to say on the

affidavit, changing her mind." Finally, Detective Eric Knowles testified that, when he arrested Davenport in connection with L.R.'s murder, "he was heavier-set at the time that he was arrested[.]"

Based on the foregoing, we hold that there was substantial evidence to support the jury's verdicts, as the jury clearly found the witnesses and their identifications of Davenport credible. As the State points out, Davenport did not challenge or object to the witnesses' in-court identifications when they were made, but instead attempted to discredit their testimony on cross-examination, as he was permitted to do by the circuit court.[1] Moreover, he merely challenges the witnesses' in-court identifications in the context of his challenge to the sufficiency of the evidence.[2] Here, there were three eyewitnesses who testified, identifying Davenport as the shooter, as well as another eyewitness's testimony that she initially identified him as the shooter and later changed her story. We have held that the testimony of one eyewitness alone is sufficient to sustain a conviction. *See Luckey v. State*, 302 Ark. 116, 787 S.W.2d 244 (1990). Furthermore, the jury is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *See White v. State*, 370 Ark. 284, 259 S.W.3d 410 (2007). For these reasons, we affirm.

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Davenport, and no prejudicial error has been found.

Affirmed.

---

[1] Pretrial, defense counsel made a comment to the circuit court regarding the possibility of in-court identifications; however, no specific objection was made, and the circuit court stated that it would allow the defense to "take care of that on your cross-examination." A review of the record reveals that no objection was made during any of the witnesses' testimony challenging their in-court identifications.

[2] In his brief, Davenport cites to factors he asserts are used by this court to determine the reliability of an in-court identification. However, that analysis is used where a challenge has been made to the admissibility of a pretrial identification as unduly suggestive. *See, e.g., Bohanan v. State*, 324 Ark. 158, 919 S.W.2d 198 (1996). There was no pretrial identification challenged in the instant case.