Cite as 2023 Ark. App. 52

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-22-363

| | | |
|---|---|---|
| OSHAYE CASTLE | | Opinion Delivered February 8, 2023 |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SEVENTH DIVISION [NO. 60CR-19-4915] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE BARRY A. SIMS, JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

**KENNETH S. HIXSON, Judge**

On December 6, 2021, appellant Oshaye Castle was convicted in a bench trial of commercial burglary, theft of property, criminal mischief, and two counts of breaking or entering. These convictions arose from a break-in that occurred at Cajun's Wharf restaurant in the early morning hours of June 5, 2019. Castle now appeals, arguing that there was insufficient evidence to support his convictions. Castle does not challenge any element of these offenses nor does he claim that they did not occur; his sole sufficiency argument is that the State failed to establish his identification as the perpetrator. Alternatively, Castle argues that the trial court's conduct at trial denied him a fair trial in various respects. We affirm.

Mary Beth Ringgold is the former owner of Cajun's Wharf, which went out of business on May 31, 2019. Castle is a former employee of Cajun's Wharf, having worked

there as a bar busser from sometime in April 2019 through May 27, 2019, when he was terminated for missing shifts. Ringgold was familiar with Castle from Castle's employment at Cajun's Wharf, and Castle had a good working knowledge of the restaurant.

Ringgold testified that in the days after Cajun's Wharf closed, she and a small group of staff members went there to clean equipment in preparation for an auction. When they came to the restaurant on June 5, 2019, they discovered that it had been broken into. Upon further inspection, it was discovered that the cash room and liquor room were broken into and large amounts of cash and liquor had been stolen. In addition, many items had been damaged, including a safe, the alarm system, and a computer. Ringgold testified that the amount of property taken and the cost of the damage totaled about $26,000.

Cajun's Wharf was equipped with video surveillance equipment, which recorded three perpetrators inside the building on three separate occasions between 1:00 a.m. and 4:30 a.m. that morning. Each time they entered the restaurant, the perpetrators were seen carrying various items, which included bags, a sledgehammer, and a saw. Ringgold testified that the crimes must have been committed by someone very familiar with the 20,000-square-foot building because "they only went to two very specific places [the cash room and liquor room] and got two very specific things."

Ringgold testified that she viewed the video surveillance recordings multiple times. From these recordings, she identified Castle as one of the perpetrators. When asked how she knew it was Castle in the video, Ringgold explained:

Well, for one, his gait, his size, the facial hair. The facial hair today and the hair today is different than it was back then. But his hair looked like that back then. The facial hair was different. It was more robust. The gait of how he moved through there. . . . But I will say when I saw that it seemed very obvious to me at the time that it was Oshaye Castle.

Ringgold was asked if she saw the defendant in the courtroom, and she stated that she did. When asked if the defendant in the courtroom was the same person she identified in the video, Ringgold stated:

> You know, to be perfectly honest and say it's been almost 30 months since this thing happened. That's Oshaye Castle. If I saw him in the grocery store, I might not recognize him today. But at that time, I recognized him as Oshaye Castle.

> On cross-examination, Ringgold testified that Castle "looks totally different today than he did then." Defense counsel asked Ringgold, "Are you comfortable enough with your identification of Mr. Castle being involved in this, that you're good for him to be convicted of five felonies?" Ringgold responded, "I was at the time. I certainly was then and I am now."

> Dan Kovach was a longtime general manager at Cajun's Wharf and knew Castle from Castle's employment there. Kovach identified Castle as one of the perpetrators from the surveillance recordings. Kovach stated, "I can't say to 100 percent that that's him" but that "he very closely looked like Oshaye Castle." Kovach stated:

> In the overall video, what stood out is the fact that when the perpetrators came into the building, they knew exactly where to go . . . there were a hundred doors in that building within the inside of that building. And none of the other doors were checked on.

On cross-examination, Kovach admitted that he had a reasonable degree of doubt as to whether it was Castle in the video recording.

Dr. Suzanne Anwar, an expert in computer science, computer vision, and machine learning, was called as a defense witness. Dr. Anwar testified that she designed a system that studies the human face for purposes of facial identification. The system depends on specific landmarks such as the distance between the eyebrow and eyelid and distance between the cheeks and nose. This system was used to compare photographs of Castle to still photographs from the surveillance recordings of the man alleged to be Castle. Dr. Anwar testified that the system did not recognize any of the surveillance photographs as Castle and stated that the results were 85 percent certain. Dr. Anwar acknowledged on cross-examination that the system is not 100 percent accurate.

Castle moved for a directed verdict on each of the five charges at the close of the evidence, arguing that the State had failed to offer sufficient proof on identification. The trial court denied the directed-verdict motion and convicted Castle of all the charges.

In this appeal, Castle first argues that there was insufficient evidence to support his convictions. Castle does not contend that a burglary did not occur, but he asserts that he was not the person who committed the criminal acts. Castle states that although Ringgold identified him from the surveillance video, she could not identify him in court. Castle further asserts that although Kovach identified Castle from the surveillance video, Kovach admitted on cross-examination that he had a reasonable degree of doubt as to his

4

identification. Castle argues that because of a lack of sufficient proof as to his identification, his convictions must be reversed.

We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id*. We will affirm a judgment of conviction if substantial evidence exists to support it. *Id*. Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id*. Further, the credibility of witnesses is an issue for the trier of fact, not the appellate court. *Ferry v. State*, 2021 Ark. App. 34, 617 S.W.3d 295. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra*.

Contrary to Castle's argument, we conclude that there was substantial evidence of Castle's identification as the person who committed the offenses. Specifically, the testimony of Ringgold was sufficient to sustain Castle's convictions. Ringgold testified that Castle's appearance had significantly changed in the thirty months between the commission of the offenses and the bench trial. Ringgold, however, identified Castle in the surveillance recordings because she was familiar with Castle's appearance when the crimes were committed. Ringgold did not equivocate; when she was asked on cross-examination whether she was comfortable with her identification of Castle she stated, "I certainly was then and I am now." Our supreme court has held that the testimony of one eyewitness alone is

5

sufficient to sustain a conviction. *Davenport v. State*, 373 Ark. 71, 281 S.W.3d 268 (2008). Moreover, the credibility of witnesses is a matter for the trier of fact. *Id.* In light of these considerations and the evidence presented, we hold that there was substantial evidence to support Castle's convictions.

For his remaining argument, Castle contends that the trial court's conduct at trial denied him a fair trial in various respects. Castle claims that he was denied a fair trial because the trial court conducted its own examination of Ringgold before the parties concluded their examination; the trial court asked Ringgold (after she had identified Castle as the perpetrator) to point out at which point on the surveillance recording that she recognized him; the trial court had a conversation with Ringgold about a drink recipe from the restaurant; the trial court conducted its own examination of Dr. Anwar; and the trial court had its law clerk provide it with a treatise on Dr. Anwar's testimony without providing it to defense counsel.

To preserve an issue for appeal, the appellant must raise the issue and make an argument at trial, and the appellant must obtain a ruling from the trial court on the issue. *Talbert v. State*, 367 Ark. 262, 239 S.W.3d 504 (2006). None of the arguments identified by Castle under his second point on appeal were raised at trial; thus, none are preserved for review.

Affirmed.

GRUBER and WOOD, JJ., agree.

*Wallace, Martin, Duke, and Russell, PLLC*, by: *Valerie L. Goudie*, for appellant.

6

*Leslie Rutledge*, Att'y Gen., by: *Brooke Jackson Gasaway*, Ass't Att'y Gen., for appellee.