

Cite as 2013 Ark. 497

# SUPREME COURT OF ARKANSAS

No. CR-12-721

| | |
|---|---|
| BILLY DALE GREEN<br>APPELLANT | **Opinion Delivered** December 5, 2013 |
| V. | APPEAL FROM THE RANDOLPH COUNTY CIRCUIT COURT<br>[NO. CR-2003-122] |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE HAROLD S. ERWIN, JUDGE |
| | <u>AFFIRMED</u>. |

**KAREN R. BAKER, Associate Justice**

On May 9, 2012, appellant, Billy Dale Green, was convicted by a Randolph County Circuit Court jury of four counts of capital murder and one count of kidnapping. Billy was sentenced to four terms of life imprisonment without the possibility of parole for the capital-murder convictions and forty years for the kidnapping conviction.[1] Billy's convictions and sentences are the result of his second trial. Billy's original convictions and sentences were reversed and remanded by this court in *Green v. State*, 365 Ark. 478, 231 S.W.3d 638 (2006) (*Green I*), based on the circuit court's error in allowing the State to present reputation and other bad-acts evidence. In 2011, we denied Billy's subsequent appeal, affirming the circuit's denial of his motion to dismiss for alleged *Brady* violations. *Green v. State*, 2011 Ark. 92, 380 S.W.3d 368 (*Green II*). Thereafter, in May 2012, Billy was tried again and convicted and,

---

[1]To aid the reader, we will refer to Billy Dale Green by his first name, Billy, as several members of the Green family testified as witnesses in this case.

SLIP OPINION

he now brings this appeal.

Billy's son, Chad Green, was originally a co-defendant and was also charged with the murders. Chad entered a guilty plea to a reduced charge and testified against Billy in Billy's first trial. However, after Billy's case was reversed in 2006, Chad refused to cooperate, his plea agreement was revoked, and he was charged as a co-defendant. Chad was tried separately, convicted and sentenced, and is not part of this appeal.

Billy now appeals from his 2012 convictions and sentences and raises ten points on appeal: (1) the circuit court erred when it denied Billy's motion for directed verdicts for capital murder and kidnapping, (2) the circuit court erred when it admitted Chad Green's out-of-court statements, (3) the circuit court erred when it denied Billy's motion for mistrial based on Bonnie Hensley Cantrell's statement, (4) the circuit court erred when it denied Billy's motion for mistrial after Mary Green Wilson's statement, (5) the circuit court erred when it denied Billy's motion for mistrial after Billy's own testimony, (6) the circuit court erred when it denied Billy's motion for mistrial based on cumulative error, (7) the circuit court erred when it gave AMI Crim. 2d 401 and 404 jury instructions on accomplice liability, (8) the circuit court erred when it denied Billy's challenge to Juror Pyles, (9) the circuit court erred when it failed to rule on Billy's motion to settle the record and (10) the circuit court erred when it amended its judgment-and-sentencing order.

This court has jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (2013). We find no error and affirm.

SLIP OPINION

*Facts*

A summary of the facts is as follows. On July 30, 1998, Lisa Elliott and her six-year-old son, Gregory, were found dead at their home in Dalton, Arkansas. Both had been killed by multiple sharp-force and blunt-force injuries. At that time, Lisa's husband, Carl Elliott, and their eight-year-old daughter, Felicia, were missing. On August 1, 1998, Carl's body was found floating in the Eleven Point River. An autopsy ruled his death a homicide as a result of two small-caliber gunshot wounds to the head, with cutting wounds to his face and neck. Felicia's remains were found two years later, on September 7, 2000, in Mud Creek in the Warm Springs area about .5 miles from Billy's home at the time. *Green I*, 365 Ark. 478, 231 S.W.3d 638. All four deaths were ruled as homicides.

Members of the Green family testified that on the night of the murders, Billy received a call from Chad and left the house to "go help clean up a mess, Chad's mess." They further testified that Billy called a family meeting and told the family that if anyone asked, he and Chad were both home the entire night on the night of the murders. They also testified that Billy always carried a side knife, and Chad always carried a .22. Billy's ex-wife, Mary Green Wilson, testified that after Billy received the phone call from Chad, she witnessed Billy put on gloves and a trench coat and leave the house. She testified that she never saw the trench coat again. Mary also testified that Carl came to their home frequently up until approximately a month before the murders. Mary also testified that around this same time, approximately a month before the murders, she overheard Billy and Chad discussing that Billy had a disagreement with Carl, and had to take care of it.

3

Phillip Shockey, an inmate at a federal correctional facility in Fort Worth, Texas, testified that while housed together with Billy at the Arkansas Department of Correction's Varner Unit, Billy told Shockey that he had killed Felicia.

Billy testified in his own defense that he was not involved with the murders, which Chad committed, and only helped Chad cover them up.

The jury convicted Billy as set forth above, and this appeal followed.

*Points on Appeal*

I. *Sufficiency of the Evidence*

For his first point on appeal, Billy asserts that the circuit court erred when it denied his motions for a directed verdict on the capital–murder and kidnapping charges. Billy argues that the evidence presented at trial does not support his capital–murder or kidnapping convictions. Further, Billy contends that the record fails to demonstrate that he committed the murders or was an accomplice to the crimes, but only demonstrates that he acted after Chad, alone, had committed the crimes. Billy asserts that Shockey's testimony is the only testimony that connects him to Felicia's murder and kidnapping, and this court should treat Shockey's "snitch testimony" like accomplice testimony, requiring corroboration. Stated differently, we should remove Shockey's testimony, and, if it is not corroborated hold that the testimony is unreliable.[2]

We treat a motion for a directed verdict as a challenge to the sufficiency of the

---

[2]We will address Billy's argument regarding treating Shockey's testimony as accomplice testimony in his seventh point on appeal.

SLIP OPINION

evidence. *Whitt v. State*, 365 Ark. 580, 232 S.W.3d 459 (2006). When reviewing a challenge to the sufficiency of the evidence, this court assesses the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Gillard v. State*, 366 Ark. 217, 234 S.W.3d 310 (2006). We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Ricks v. State*, 316 Ark. 601, 873 S.W.2d 808 (1994). We need consider only that testimony which supports the verdict of guilty. *Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). Further, circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003). Whether the evidence excludes every other hypothesis is left to the jury to decide. *Carmichael v. State*, 340 Ark. 598, 12 S.W.3d 225 (2000). Finally, the credibility of witnesses is an issue for the jury and not the court. *Burley v. State*, 348 Ark. 422, 73 S.W.3d 600 (2002). The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Id.*

Billy was convicted of capital murder and kidnapping. Ark. Code Ann. § 5-10-101(a)(4) (Repl. 1997) states in pertinent part:

(a) A person commits capital murder if:

. . .

SLIP OPINION

(4) With the premeditated and deliberated purpose of causing the death of another person, he causes the death of any person.

"Premeditation and deliberation may be formed in an instant. *Winston v. State*, 372 Ark. 19, 269 S.W.3d 809 (2007). Intent can rarely be proven by direct evidence; however, a jury can infer premeditation and deliberation from circumstantial evidence, such as the type and character of the weapon used; the nature, extent, and location of wounds inflicted; and the conduct of the accused. *Id.*" *Stephenson v. State*, 373 Ark. 134, 136–37, 282 S.W.3d 772, 776–77 (2008).

Our kidnapping statute, Ark. Code Ann. § 5-11-102 (a)(4) (Repl. 1997), provides in pertinent part:

(a) A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty with the purpose of:

. . .

(4) Inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him.

The State's theory of the case was that Billy was Chad's accomplice. In cases where the theory of accomplice liability is implicated, we affirm a sufficiency-of-the-evidence challenge if substantial evidence exists that the defendant acted as an accomplice in the commission of the alleged offense. *Cook v. State*, 350 Ark. 398, 86 S.W.3d 916 (2002). Our accomplice-liability statute, Arkansas Code Annotated § 5-2-403 (Repl. 1997), provides that,

(a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, he:

(1) Solicits, advises, encourages, or coerces the other person to commit it; or

6

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing it; or

(3) Having a legal duty to prevent the commission of the offense, fails to make proper effort to do so.

(b) When causing a particular result is an element of an offense, a person is an accomplice in the commission of that offense if, acting with respect to that result with the kind of culpability sufficient for the commission of the offense, he:

(1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the result; or

(2) Aids, agrees to aid, or attempts to aid the other person in planning or engaging in the conduct causing the result; or

(3) Having a legal duty to prevent the conduct causing the result, fails to make proper effort to do so.

Ark. Code Ann. § 5-2-403(a)(1)–(3), (b)(1)–(3) (Repl. 1997).

Accordingly, one can be an accomplice if he solicits, advises, encourages, or coerces the other person to commit the offense; or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense. *Id.* Under the accomplice-liability statute, a defendant may properly be found guilty not only of his own conduct, but also the conduct of his accomplice; when two or more persons assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of both. *Clark v. State*, 358 Ark. 469, 192 S.W.3d 248 (2004). There is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id.*

Turning to the facts in Billy's case, we must review the testimony presented.

At trial, Eddie Rose, a 911 operator for Randolph County, testified that he received

7

a call on July 30, 1998, at 12:22 a.m. from Lisa Elliott's mother, Mary Thomas.[3] Rose received the call from Thomas on the dispatch office's regular-business telephone line with a request to conduct a welfare check at the Elliott home after it was reported that screams were heard from the Elliott home. Rose also testified that there were thunderstorms in the area that night, but he did not receive reports of flooding in Dalton. Deputy Sheriff Randy Barber arrived at the Elliott home at 1:15 a.m. and at 1:18 a.m. reported back to dispatch "all [was] quiet and he had no contact at the residence." Rose further testified that he received a second call from Thomas around 6:31 a.m. with a report regarding the Elliotts' residence again. Rose testified that Thomas was hysterical and that it took him some time to get the information from Thomas, but the report was that Lisa was dead on the front porch. Rose further testified that he received a third call at 6:50 a.m. from Virginia DuBois[4] reporting that Lisa was dead on her front porch and she could not open the door to leave the home because Lisa's body was blocking the door.

Rob Samons, the Randolph County Sheriff at the time of the murders, testified that on the early morning of July 30, 1998, he was dispatched to the Elliott home after receiving a report that "someone had found their dead daughter on their front porch" at the Elliotts' address. Samons arrived at the scene at 7:09 a.m. Samons testified that immediately upon

---

[3]Mary Thomas did not testify at trial. Thomas relayed messages to 911 dispatch as she received information from Virginia DuBois. DuBois is Lisa Elliott's ex-stepmother and lived in a house-trailer on the same property adjacent to the Elliotts' home with her husband Kenny DuBois. The DuBoises did not testify at trial. Sheriff Rob Samons testified that the DuBoises were "not right."

[4]In the record, Virginia DuBois is also referred to as Virginia Miller.

SLIP OPINION

entering the home he saw Gregory lying on the living room floor, deceased. The house was quiet except for a television that was on, and there was blood and indications of a struggle in the kitchen, on the Venetian blinds, the windows, the floors, and the heat-and-air-conditioning unit in one of the windows. Samons also testified that there was evidence of a struggle on an intercom system inside the Elliott home. The intercom system was connected to the DuBois house-trailer adjacent to the Elliott home. While he was outside the Elliott home with other investigators, discussing the search with another officer, Samons testified that he saw Lisa's body on the porch of the DuBois house-trailer across from the Elliott home. He believed Lisa had crawled through the window of the Elliott home, reached the DuBois house-trailer across from her home, and had been banging on the door.

Steve Huddleston, an investigator in the criminal division with the Arkansas State Police at the time of the murders, testified that he arrived at the scene and assisted in the investigation. He testified that there was blood throughout the house, including but not limited to the dining room, the kitchen, the appliances in the kitchen, the windows, the Venetian blinds, and the window unit. Huddleston also testified that he found a tire tool in the children's bedroom on the floor under one of the beds.

Kermit Channel, a forensic State Crime Laboratory investigator in serology and DNA at the time of the murders, testified that he processed the evidence submitted to the crime lab during the Elliot family's murder investigation. Channel testified that only Lisa's and Gregory's DNA and blood were found at the home. He further testified that the tire tool was tested and DNA and blood were consistent with Lisa's and Gregory's. Channel testified that

he would reason that a third party was handling the tire tool, but the individual either did not shed DNA or was wearing gloves because there was no other DNA found on the tool. Channel also testified that a sample of material from one of the seats in the Elliotts' vehicle was also tested, and the Green males could not be excluded from that sample.

Dr. Frank Peretti, a forensic pathologist with the Arkansas State Crime Lab, performed autopsies on each of the Elliotts, and all four deaths were determined to be homicides. Carl's death was the result of two gunshot wounds to the head, with one at point-blank range, and the other shot from farther away. Carl also had cutting wounds to his face and neck. Peretti testified that Carl's wounds were consistent with being inflicted by a knife and a small caliber gun. Dr. Peretti next testified that Gregory's death was caused by at least nine blunt-and-sharp-force trauma wounds, and that the wounds were consistent with wounds that could have been caused by a tire tool and by a knife. Dr. Peretti also testified that Gregory suffered cutting wounds that, among other things, cut through his trachea and his carotid artery, consistent with being inflicted by a knife. Dr. Peretti testified that Lisa Elliott died from multiple blunt-force trauma wounds, at least twenty-seven, and also suffered stabbing and cutting wounds. Lisa had defensive wounds to her hands and suffered multiple wounds to her head and neck. Lisa's cutting wounds were consistent with a knife, and the blunt-force trauma wounds could have been caused by a tire tool. The stabbing wounds Lisa suffered cut her trachea completely in half, cut her carotid artery in half, and cut her jugular vein in half. Finally, Dr. Peretti testified that Felicia's death was a homicide by undetermined means.

Phillip Shockey, an inmate in federal prison in Fort Worth, Texas, serving time for

10

SLIP OPINION

wire fraud, also testified. At the time Shockey testified, he had been paroled in Arkansas and was serving time for his federal conviction, but testified that he was not offered a reduction of time or leniency from Arkansas authorities or federal authorities in exchange for his testimony.

Shockey testified that he had previously been incarcerated in Arkansas and was housed at the Varner Unit of the Arkansas Department of Correction in the same barracks with Billy. Shockey testified that he had a friend, Canah, from the same hometown who was much younger than Shockey. At that time, Canah was in his midtwenties, and Shockey in his midforties. Canah received mail regularly from his girlfriend. Shockey asked Canah if his girlfriend had a friend that would send letters to Shockey. Canah responded that Shockey was an old man and too old for his girlfriend's friends. Shockey responded that he liked young girls, the younger the better. As Shockey made this comment, Billy walked up and overheard the end of their conversation and smiled. Shockey testified that a few days later, Billy approached him and told Shockey that he liked young girls as well. Shockey explained to Billy that the girls he was referencing were in their twenties. He testified that Billy stated "there ain't no pussy like young pussy. And I mean young pussy. You know what I am talking about."

Shockey testified that Billy then asked Shockey if he knew what Billy was incarcerated for and told Shockey about the Elliott murders. Shockey testified that Billy explained the murders as follows: everyone thought the Elliott murders were about drugs but it was actually about Chad "messing" with Felicia and that Carl and Lisa Elliott knew about it. Shockey

11

SLIP OPINION

testified that Chad set up a meeting with Carl by the creek to discuss the issue, shot Carl in the head, then went to the Elliott house, beat the brother to death, killed the mom, and was looking for Felicia when he heard banging on a door. Chad realized the mom had crawled through the window to the trailer next door and he finished killing her by cutting her throat. Chad went back and got Felicia and put her in the back of his truck and called Billy, reporting that he had messed up. Billy told Chad, "Don't say another word" and went to meet Chad. They took Felicia to a house, kept her in a trash can with a bungee cord across the lid, and then raped her for two days. They kept her in the trash can on the back porch with a bungee cord on it so she could not get out, sometimes for hours. Billy then told Chad "All good things must come to an end" but because Chad "loved" Felicia, he could not kill her– so Billy carried her into the woods. Billy told Shockey that Felicia said "please don't hurt me." Billy took her into a creek in the woods, and when the water was at a level over Felicia's head, Billy held her under and cut her throat.

Shockey further testified that he thought Billy told him the story because Billy thought that Shockey liked young girls, and they were "kindred spirits." Shockey went on to testify that Billy explained that he had not raised his son to be a pedophile, but "if someone crossed you, you take them out, even if it meant taking out the whole family. [That] is how they do things in Pocahontas." He said everybody knows Billy as "Wild Man," and "[t]hey knew not to cross Billy Green." Shockey testified that the story made him sick, that he had a daughter Felicia's age, and that no child deserved what Billy and Chad had done.

Bonnie Hensley Cantrell, Chad's former girlfriend, also testified. Bonnie testified that

SLIP OPINION

she had known Chad her entire life and had known Billy since she was a teenager. She testified that Chad always carried a .22 and Billy always carried a knife on his belt loop. Bonnie testified that the morning after the murders, she received a call from Chad at her workplace, Archer's Café, at approximately 8:00 a.m. Chad did not have a ride and told her to pick him up at his great-grandmother's house on Allen Trail. Bonnie testified that she left work and went and picked up Chad. Chad came out from behind the house, got in the car, and said, "Quick let's get out of here before somebody sees us." Bonnie testified that Chad was wearing long-sleeved coveralls and when they arrived at her home, he took the coveralls off. She testified that he was scratched and torn up like "somebody had beat him with saw-briars," and was a bloody mess. Chad went to shower and Bonnie returned to work. Bonnie testified that when she came home from work that day, Chad was gone. Bonnie testified that several days later, she went to Chad's parents' house where he lived off and on to pick up some of her belongings. Bonnie testified that when she arrived, Billy was outside the home. Once Chad came out of the home, Billy looked at Chad and Bonnie with his hands on his hips and said, "[W]hat are you doing telling lies that – telling them lies that Chad was with you the other night when you know damn well he wasn't." Bonnie testified that she responded, Chad had told her to tell people he was with her the night of the murders. Bonnie further testified that Billy intimidated and scared her and said something to the effect of "get the hell out of here and don't come back." Bonnie testified that as a result of that conversation, she went to law enforcement.

Several of the Green family members also testified at trial. Mary and Billy have five

children.  Three of those children were in Randolph County at the Green home on the night of the murders, Jason, Amber and Josh. Mary and those three children testified.

Mary testified that she knew Carl and Lisa Elliott and their children.   She testified that Carl ran around with Billy and Chad, and Carl came to their home frequently, approximately two or three times a week.  She further testified that approximately one month before the murders, Carl had stopped coming around.  Mary also testified that during this time she overheard Billy telling Chad that Carl had ripped him off and they were going to have to take care of it.  Mary testified that Billy was mad about the situation.  She testified that she paid attention to the conversation because she had noticed that Carl had stopped coming by their house.  Mary further testified that Billy was a drug dealer.

Mary's testimony with regard to the night of the murders is as follows.  She worked the 3:00 p.m.–11:00 p.m. shift at Pocahontas Nursing and Rehabilitation, drove her regular route home which took 15–20 minutes, and arrived home around 11:20 p.m.  Mary testified that she drove her regular route, and not the longer route she drove when the roads were flooded.  She testified that when she arrived home, Billy, Jason, Amber, and Josh were all at the home.  Mary testified that the phone rang, Amber answered it, announced it was Chad, and she and Billy both headed for the phone.  Mary testified that she wanted to talk to Chad because she had not done so in a while; however, Billy went to the phone, talked to Chad for a few minutes but would not let Mary talk to Chad.  Mary testified that as soon as Billy hung up the phone with Chad, he then headed to the bedroom and Mary followed upset that she was not able to talk to Chad.  When they got to the bedroom, Billy grabbed his trench

14

coat and some gloves. She testified that Billy said he had to "go clean up a mess, Chad's mess," got in his truck and took off. She testified that Billy usually carried a knife and a pistol and kept a rifle or shotgun in his truck.

Mary further testified that they always had a police-scanner on in their home and later that night after Billy had left she heard a report of a domestic disturbance at the Elliott home in Dalton. She testified that the first thought in her mind was that she hoped Billy and Chad were not involved because they had plenty of time to get to the Elliotts' home. Mary testified that she did not see Billy again until the next day and she never saw the trench coat again.

Mary further testified that she next saw Billy around daybreak the following day when he asked her to go get Chad to meet him and the other Green sons at an intersection so they could go to work. Mary testified that Chad was relying on them for transportation and Billy asked her to go get Chad because Billy did not have enough gas in his truck. Mary went to get Chad, but she could not wake him and he never came out. She then continued to the intersection to meet Billy. Mary testified that once she met up with Billy, Billy instructed her to tell the police that Billy was home all night with her and that "when you went to get Chad for work he had a toothache or was sick and couldn't go to work."

Mary testified that some time after the murders, the police came to her workplace and questioned her. She testified that within twenty or thirty minutes after she met with law enforcement, Billy called her at work and said he had heard "you had company" and they needed to have a family meeting. Mary testified that she called all of the kids and arranged for everyone to come meet at their home after she got off work. That evening Billy gathered

the family and told them they needed to tell people he was home all night the night of the Elliott murders.

Jason Green testified that he was at the Green home the night of the murders, that he went to bed around 9:00 p.m. or 10:00 p.m., and that his dad was at home when he went to bed. Jason testified that Chad always carried a .22 with him and Billy carried a side knife. Jason further testified that some time after the murders, Billy called a family meeting and instructed everyone to tell the authorities that the family were all at home that night, including Billy and Chad. Jason also testified that his brother, Josh, and Josh's girlfriend, Tracy, were ousted from the family meeting because Tracy was not family and Billy got mad and made Josh and Tracy leave.

Amber Green, one of Billy's daughters, testified that she was also at home on the night of the murders, and that Chad called the house. She testified that her dad, Billy, talked to Chad and then left to go help Chad, and she did not see her dad until the following day. Amber also testified that she heard the police-scanner report of a domestic-disturbance call in Dalton on the night of the murders.

Billy testified in his defense that he had known Carl Elliott. He further testified that he was at home in Warm Springs on the night of the murders, did not receive a phone call from Chad that night, and had not seen Chad for several days. Billy testified that his wife, Mary, called that night prior to leaving work to check on the road status and to make sure that the roads were not flooded. Billy further testified that on August 1, 1998 Chad called him to come pick him up, and as they were driving Chad admitted to killing the Elliott family

16

and that Chad began to cry. Billy testified in detail that Chad had committed the murders but that he did not have anything to do with the murders, only the cover-up. Billy testified that he and his family were aware that Chad had committed the murders but they did not turn Chad in because they feared he would be executed.

Based on the preceding facts and circumstances, we hold that there is substantial evidence to support Billy's convictions and sentences and the circuit court did not err in denying Billy's motions for directed verdicts.

First, the State offered proof through Samons that the deaths were homicides. Samons testified that he was dispatched after the DuBoises' and Thomases' report of "their dead daughter on their front porch" at the Elliotts' address. Samons found the body of Gregory Elliott inside the Elliotts' home, and Lisa Elliott on the front porch of a nearby house-trailer. Samons also testified that on August 1, 1998, deputies found Carl Elliott's body floating in the river. Samons further testified that on September 7, 2000, Felicia's remains were found in Mud Creek in the Warm Springs area about .5 miles from where Billy lived.

Second, the State offered proof through Huddleston's testimony that he found a tire tool with blood on it in the Elliott children's bedroom.

Third, with regard to causes of death, Peretti testified that all four were homicides, with Carl's, Lisa's, and Gregory's deaths consistent with having been caused by a small-caliber gun, a knife, and a tire tool. Carl had cutting wounds from a knife and had been shot twice, once point-blank and once from farther away, with a small-caliber gun. Lisa and Gregory were both severely beaten and killed with a tool consistent with a tire tool and a knife had

17

been used to cut each of their throats. Felicia's remains were found approximately .5 miles from Billy's home.

Fourth, Shockey's testimony is sufficient to allow the jury to conclude that Billy was a principal or an accomplice in the crimes. Shockey testified that Billy was aware Chad had a disagreement with the Elliotts, and also offered proof that Billy concealed the crimes from law enforcement. He further testified that Billy admitted killing Felicia.

Fifth, Bonnie testified that Billy always carried a side knife and Chad carried a .22. Bonnie also testified that Billy intimidated her by telling her that she better quit lying about Chad's whereabouts on the night of the murders because Chad and Billy were at home together that night.

Sixth, Mary's testimony established Billy's relationship with the Elliotts, the disagreement between Billy and Carl, and Billy's anger about the situation. Mary further testified that she arrived home at 11:20 p.m., after driving her regular 15-20 minute drive home as there was no flooding to send her on a longer alternate route. Mary testified Billy received a phone call from Chad, left to help clean up Chad's mess, put a trench coat and gloves on, left the home, and had plenty of time to get to the Elliotts' home before she heard the call on the police-scanner about the disturbance in Dalton. Mary also testified that Billy carried a knife and a pistol with him. She testified she never saw Billy's trench coat again and that after the murders, Billy instructed his family to lie concerning his whereabouts the night of the murders and to manufacture an alibi that he was in fact home that evening. Mary also testified that the morning following the murders, Billy sent her to pick up Chad, and when

SLIP OPINION



she reported that Chad was not there, Billy told her that if she was asked, to say that Billy was home all night and that Chad had a toothache or was too sick to come to work.

Seventh, the State offered proof of Billy's concealment of the crimes when Jason testified about the family meeting and that Billy told him that, if he was asked, to say that everyone was at the house on the night of the murders, including Billy and Chad. Jason further testified that Billy carried a side knife and Chad carried a .22.

Eighth, the State offered proof of Billy's connection to the crimes when Amber testified that on the night of the murders, Billy received a phone call from Chad and, shortly thereafter, left to go help Chad. Amber also testified that she heard the police-scanner report a domestic disturbance in Dalton that night.

Upon review, the testimony presented at trial, viewed in the light most favorable to the State, establishes the crimes were committed and connects Billy to the crimes. Evidence was offered to establish Billy's relationship with the victims and the disagreement between Carl and Billy. Evidence was also offered that Billy always carried a knife and a small–caliber pistol with him. Evidence was further offered to establish Billy's whereabouts on the night of the murders including evidence that Billy received the phone call from Chad, left to go clean up a mess, Chad's mess, and that Billy left in a trench coat and gloves. Evidence was offered that Billy had the time to reach the Elliotts' home in Dalton and commit the murders before the disturbance report on the police-scanner. Evidence was further offered of Billy's attempt to conceal the crimes and to manufacture an alibi. Finally, evidence was offered that Billy killed Felicia.

A family member's testimony that he or she was asked to lie about an appellant's whereabouts during the commission of a crime is sufficient to connect the appellant to the crimes. *See Green I*, 365 Ark. at 647– 48, 231 S.W.3d at 487–88. Further, we have held that,

> [t]he jury is not required to lay aside its common sense in evaluating the ordinary affairs of life, and it may infer a defendant's guilt from improbable explanations of incriminating conduct. *Branscum v. State*, 345 Ark. 21, 43 S.W.3d 148 (2001); *Chapman v. State*, 343 Ark. 643, 38 S.W.3d 305 (2001). [Additionally,] . . . false and improbable statements may be considered as evidence of guilt. *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000).

*Martin v. State*, 346 Ark. 198, 205, 57 S.W.3d 136, 141 (2001).

Finally, the credibility of witnesses is a matter for the jury's consideration. *Tryon v. State*, 371 Ark. 25, 263 S.W.3d 475 (2007). "This court does not attempt to weigh evidence or assess the credibility of the witnesses, as that determination lies within the province of the trier of fact. The jury may resolve questions of conflicting testimony and inconsistent evidence and may choose to believe the State's account of the facts rather than the defendant's." *Id.* at 32, 263 S.W.3d at 481. "Where the testimony is conflicting, we do not pass upon the credibility of the witnesses and have no right to disregard the testimony of any witness after the jury has given it full credence, where it cannot be said with assurance that it was inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon." *Davenport v. State*, 373 Ark. 71, 73, 281 S.W.3d 268, 270 (2008). The trier of fact is free to assess inconsistencies in witness testimony. *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975).

Accordingly, when viewed in the light most favorable to the State, the evidence is sufficient evidence for the jury to convict Billy. We hold that substantial evidence supports

20

SLIP OPINION

Billy's convictions and the circuit court properly denied Billy's motions for directed verdicts.

## II. *Chad Green's Out-of-Court Statements*

For his second point on appeal, Billy asserts that the circuit court erred when it admitted Chad's out-of-court statements and violated his Sixth Amendment rights under the Confrontation Clause to confront his accuser. Billy asserts that Samons's testimony regarding Chad's prior statements to Samons were used to prove that they were in fact false and to prove that Chad was involved in the murder of the Elliotts. Billy contends that the circuit court erred because Samons's testimony concerning Chad's statement violated the Confrontation Clause and was impermissible testimony. The State agrees that the statement was testimonial in nature but is not subject to the Confrontation Clause because the statement was admitted only to show police action.

At issue is Sheriff Ron Samons's testimony regarding his investigation of the Elliott deaths. The following colloquy occurred:

| | |
|---|---|
| PROSECUTOR: | On August 8th, some nine days after the homicides, did you have the occasion to speak with Chad? |
| SHERIFF SAMONS: | I did. |
| PROSECUTOR: | And again, this is taking the steps in the investigation on this that you talked to him? |
| SHERIFF SAMONS: | Yes. |
| PROSECUTOR: | Was he a suspect . . . |
| SHERIFF SAMONS: | No. |
| PROSECUTOR: | . . . at that time? |

SHERIFF SAMONS:          No.

PROSECUTOR:          Okay. Can you tell us did he indicate to you whether he knew the Elliotts?

SHERIFF SAMONS:          Yes.

PROSECUTOR:          What did he say?

SHERIFF SAMONS:          He said he – he said, I know Allen Elliott – who is Carl Allen Elliott.
He said, I know Allen Elliott, but not real well. I've known him for a pretty good while.

PROSECUTOR:          Did he indicate to you when was the last time he had seen – and again ...

DEFENSE COUNSEL:          Can we approach?

The circuit court overruled Billy's objection to testimony about Chad's statement and admonished the jury:

THE COURT:          All right. Ladies and gentleman of the jury I am going to give you a limiting jury instruction. And that is that the testimony about Charles Wayne Green with regards to the sheriff that he is testifying to is not offered for the truth of the matter asserted in this trial but is simply offered as to the furtherance of his investigation and how it proceeded.

The circuit court allowed Samons to continue testifying about his investigation. Samons went on to testify about Chad's statements regarding his whereabouts on July 30, 1998, and that Chad may have been stranded at his grandparents' house on Allen Trail without transportation. Samons then testified regarding his meeting with Bonnie Hensley Cantrell, Chad's former girlfriend.

In order for hearsay statements to be admissible against a defendant at a criminal trial,

22

two separate requirements must be met. *See Crawford v. Washington*, 541 U.S. 36, 60 (2004). First, an exception to the general rule prohibiting hearsay must be demonstrated. Second, the admission of the hearsay cannot violate the defendant's Sixth Amendment right "to be confronted with the witnesses against him." *Chambers v. State*, 2012 Ark. 407, at 4, ___ S.W.3d ___, ___ (internal citations omitted). Thus, for the Confrontation Clause to be invoked, the statement must be testimonial in nature, and admitted for its truth. *Id.*

Here, the testimony was not admitted for its truth but was admitted to explain a series of police actions in the police investigation. Further, the jury was instructed to consider the statements only for that purpose. We are unpersuaded by Billy's argument, and we affirm the circuit court on its ruling regarding Chad's out-of-court statements.

### III. *Bonnie Hensley Cantrell's Statement*[5]

For his third point on appeal, Billy asserts that the circuit court erred when it denied Billy's motion for mistrial based on Bonnie Hensley Cantrell's statement that she traded "sex for drugs" with Billy when she was fifteen years old. Billy contends that Bonnie's statement was highly prejudicial and could not be cured by a limiting instruction, and the circuit court erred in not granting a mistrial. The State responds that Billy has failed to demonstrate unfair prejudice, and the instruction cured any error; it urges this court to affirm the circuit court.

At issue is the following testimony from Bonnie on direct examination:

PROSECUTOR:   Approximately, how long have you known Billy Green?

BONNIE:   Since I was probably ten, twelve years old.

---

[5]Bonnie Hensley Cantrell testified at the first trial as Bonnie Hensley.

23

PROSECUTOR:          So . . .

BONNIE:          Pretty much all of my life.

PROSECUTOR:          Okay.  How old are you now?

BONNIE:          Forty-seven.

PROSECUTOR:          And how long have you know Chad Green?

BONNIE:          Pretty much all his life.

PROSECUTOR:          Now I've – I need for you to explain to the jury, how did you get to know Billy Green?

BONNIE:          I met him in a bar parking lot.

PROSECUTOR:          Would it be fair to say that at one point in time you were romantically involved with Billy Green?

BONNIE:          Not romantically.  We traded sex for drugs.

PROSECUTOR:          Ah– and approximately how long ago was that?

BONNIE:          When I was about fifteen.

PROSECUTOR:          And in the course of knowing Billy Green, have you known him to be . . .

DEFENSE ATTORNEY:          Your Honor, may we approach?

DEFENSE ATTORNEY:          Your Honor, I move for a mistrial based on that last statement.  She testified that she knew Billy by trading sex for drugs.

Billy asserts that there is no remedy for curing Bonnie's testimony, it was too prejudicial, and the circuit court erred by not granting a mistrial.  We disagree.  The record demonstrates that after the objection, the circuit court found that the statement was not elicited in bad faith, and denied the motion for mistrial.  The circuit court admonished the

jury that the statement was inadmissible and to disregard the statement.

Further, the record demonstrates that after much debate and consideration, the circuit court sent the jury home at the end of the day, came back the following morning and made his ruling after the circuit court had time to review case law and think about its decision. The circuit court explained his ruling to the attorneys as follows:

| | |
|---|---|
| THE COURT: | The Court is going to rule that this was not solicited in bad faith. That, while egregious, the Court is not going to declare a mistrial. And I will admonish the jury to the extent of saying that the last response by the witness was inadmissible as evidence and they are not to consider this evidence in their deliberations. |

Over Billy's continued objections that an instruction would not cure the testimony, and that a mistrial should be granted, the circuit court then gave the following admonishment to the jury:

Okay. We broke yesterday with Bonnie Hensley Cantrell on the witness stand. And her last response – I am limiting the jury. The last response by the witness – that response the Court has ruled that that is an inadmissible response or inadmissible testimony.

Therefore, you are not to consider that in any way in your consideration of this case. Is that understood?

*Jurors nod*

I need everybody to nod. Is everybody with me? Does everybody know what I am talking about?

*All jurors nod and some respond verbally with yes.*

Turning to our law regarding mistrials, a mistrial is an extreme and drastic remedy to be resorted to only when there has been an error so prejudicial that justice cannot be served

by continuing the trial. *Russell v. State*, 306 Ark. 436, 815 S.W.2d 929 (1991). The granting or denial of a motion for mistrial lies within the sound discretion of the trial judge, and the exercise of that discretion should not be disturbed on appeal unless an abuse of discretion or manifest prejudice to the complaining party is shown. *King v. State*, 298 Ark. 476, 769 S.W.2d 407 (1989). Further, in dealing with issues relating to the admission of evidence pursuant to Arkansas Rule of Evidence 404(b), a trial court's ruling is entitled to great weight and this court will not reverse absent an abuse of discretion. *Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004); *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001).

In *Hall v. State*, 314 Ark. 402, 862 S.W.2d 268 (1993), we reviewed a challenge to the denial of a mistrial regarding a police officer's comments about Hall's previous illegal conduct. We explained:

> This Court has observed that there is always some prejudice that results from the mention of a prior bad act in front of the jury. *Strawhacker v. State*, 304 Ark. 726, 804 S.W.2d 720 (1991). In instances where the infraction creates minimal prejudice the proper remedy is an objection to the evidence and an admonition or instruction to the jury to disregard the remark. *Salinger v. State*, 310 Ark. 690, 840 S.W.2d 797 (1992). A motion for mistrial is only appropriate where the error is beyond repair and cannot be corrected by any curative relief. *Id.*; *Enos v. State*, 313 Ark. 683, 858 S.W.2d 72 (1993). The trial court has wide discretion in granting or denying a motion for mistrial, and the decision of the trial court will not be reversed except for abuse of discretion or manifest prejudice to the complaining party. *Davasher v. State*, 308 Ark. 154, 823 S.W.2d 863 (1992).

*Id.* at 405-06, 862 S.W.2d at 270.

In *Strawhacker v. State*, 304 Ark. 726, 804 S.W.2d 720 (1991), we addressed a police officer's testimony about Strawhacker's prior illegal conduct. The following testimony regarding Strawhacker was challenged:

DETECTIVE: We began to research through our department files to see what information we might have on Mr. Strawhacker. The only thing that we could find there was that he had been involved in a fight in May of 1989. We didn't have any current photographs of him on file, but we did have a misdemeanor arrest warrant for him for failure to answer a summons on a failure to pay fines and costs on an original charge of third degree battery.

*Id.* at 728, 804 S.W.2d at 722.

We affirmed the circuit court's denial of Strawhacker's motion for mistrial, and explained that there was no deliberateness on behalf of the prosecutor, and the prosecutor's action was inadvertent and did not specifically elicit the response from the detective. We stated, "[a]ny prejudice . . . was sufficiently cured by the trial court's admonishment, and the trial court was correct in denying the mistrial motion under these facts." *Id.* at 728, 804 S.W.2d at 722.

Finally, in *Novak v. State*, 287 Ark. 271, 698 S.W.2d 499 (1985), we discussed several cases dealing with testimony regarding the defendant's previous illegal conduct and revisited our case law and explained, "We have said in a myriad of cases that mistrial is a drastic remedy and rests with the discretion of the trial judge. It should be granted only when the prejudice is so manifest that the trial cannot in justice continue." *Id.* at 277, 698 S.W.2d at 503 (citing *McFarland v. State*, 284 Ark. 533, 684 S.W.2d 233 (1985)); *see also Sanders v. State*, 277 Ark. 159, 639 S.W.2d 733 (1982) (affirming the trial court's denial of a mistrial motion in a rape trial where one police officer mentioned seeing what he believed to be controlled substances in the defendant's bedroom and another officer said he remained in the house "collecting evidence on the other charge"); *Hill v. State*, 275 Ark. 71, 85, 628 S.W.2d 284,

291 (1982) (we affirmed a psychiatrist for the prosecution, testifying on the defendants sanity, when asked what he relied on for his opinion, mentioned certain test results and added, "I also had access to his prison records."); *Hogan v. State*, 281 Ark. 250, 663 S.W.2d 726 (1984) (upholding the trial courts' refusal to order a mistrial where a police officer, asked by the prosecutor if these fingerprints were the first taken of the defendant, answered, "No, sir, that's all I took. We do have a prior arrest record on him, which we do have a fingerprint on."); *see Mitchael v. State*, 309 Ark. 151, 155, 828 S.W.2d 351, 354 (1992) (denying mistrial after statement regarding previous arrest warrant for rape because the jury probably believed the warrant had been issued on the current rape charge).

After a careful review of the testimony at issue, our case law, and with our standard of review in mind, we are not convinced that Bonnie's testimony rises to the level of requiring the granting of a mistrial. Here, the jury already knew of Billy's issues with drugs as it was referenced in opening statements without objection. The trading sex-for-drugs portion of Bonnie's testimony was impermissible; however, the circuit court admonished the jury to disregard the statement. The judge was careful not to repeat Bonnie's prejudicial remark in case the jurors did not hear it the first time. The trial court is in a better position to determine the effect of such remarks on the jury, and the judge concluded that Bonnie's remarks about her relationship with Billy was insufficient to warrant a mistrial. We cannot say that the trial court abused its discretion in denying Billy's motion for a mistrial. From a thorough review of this record, we are satisfied that Billy received a fair trial and affirm the circuit court on Billy's third point on appeal.

## IV. *Mary Green Wilson's Statement*

For his fourth point on appeal, Billy asserts that the circuit court erred by not granting a mistrial with regard to three statements made by Mary regarding her conversations with law enforcement during their investigation of the Elliott murders. We will address each of Mary's statements individually.

First, on direct examination, Mary testified that law enforcement came to her work and met with her regarding the Elliott murders. She testified as follows:

> It wasn't twenty or thirty minutes after I got out of that meeting with them that Billy called me at work. And he said, "I heard you had some company."

Billy argues that this testimony was inadmissible as it goes to demonstrate Billy's control over Mary. However, the record demonstrates that Billy did not object to this statement at trial. Failure to object at the first opportunity waives any right to raise the point on appeal. *Gibson v. State*, 316 Ark. 705, 875 S.W.2d 58 (1994). Because he did not make a timely objection below, this court cannot reach the issue.

Second, during cross-examination, Mary testified that she initially did not tell the police the truth when they came to visit her at work. The following colloquy occurred:

> DEFENSE ATTORNEY:     So you lied to the police?
>
> MARY:     I guess I did. I evaded the truth because I was not free to tell the truth.

Defense counsel then moved for a mistrial, stating,

> That is a mistrial. She – it goes right back to the statement she testified before. It goes to the control issue. The Supreme Court specifically said they can't testify to Billy's control. And her testimony was, 'I wasn't free to tell the truth.'

The circuit court overruled the objection, denied the motion for mistrial, struck Mary's answer, and instructed the jury to not consider it.

Billy asserts that Mary's statement was highly prejudicial and goes to Billy's control over Mary, which was inadmissible per *Green I.*

We hold that any error regarding this statement constitutes invited error. Under the doctrine of invited error, one cannot be heard to complain of that error for which he was responsible. *McGhee v. State*, 330 Ark. 38, 954 S.W.2d 206 (1997). Here, although Billy's counsel did not intend for Mary to make such a statement, it nevertheless was made in response to his questioning. Where a witness's answer was a legitimate response to a question posed by defense counsel, such testimony was invited by the appellant and the circuit court did not abuse its discretion in refusing to declare a mistrial. *See Woods v. State*, 342 Ark. 89, 27 S.W.3d 367 (2000); *Hogan v. State*, 281 Ark. 250, 663 S.W.2d 726 (1984). As a result, Billy cannot complain of any error that may have resulted from his counsel's questioning of Mary. Further, the circuit court instructed the jury to not consider the testimony, and we presume that a jury follows the circuit court's instructions in deciding the case. *Hall v. State*, 315 Ark. 385, 391–92, 868 S.W.2d 453, 456–57 (1993). We do not find error with regard to Mary's second statement.

Third, Billy asserts that Mary's statement on redirect was also prejudicial error. Prior to redirect, Billy and the State had conferenced with the judge at the bench concerning this line of questioning. Billy objected to the questioning and said it went to Billy's control or influence and objected to the questions. The circuit court overruled the objection and

allowed the question.  On redirect the following colloquy occurred:

PROSECUTOR:              With regard to all of the statements . . . to the police officers . . . from you early on in this investigation of the case; before you gave any of those statements, who was the only person who ever told you what to tell the police in case they ask.

MARY:                    Billy Green

Billy asserts that it was error for the circuit court to allow this questioning and the testimony was error because it served only to reiterate that she was not free to tell the truth because of Billy's influence.  Billy argues that Mary's testimony implicated the issue of Billy's "control" over her.

This court reviews evidentiary rulings using an abuse–of–discretion standard; trial courts are afforded wide discretion in evidentiary rulings. *See Hawkins v. State*, 348 Ark. 384, 72 S.W.3d 493 (2002).  In issues relating to the admission of evidence a trial court's ruling is entitled to great weight and will not be reversed absent an abuse of discretion. *Cook v. State*, 345 Ark. 264, 45 S.W.3d 820 (2001); *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000).

Although Billy asserts that the circuit abused its discretion, we disagree. Mary testified that Billy told her to lie to the police, which is evidence that he was creating a false alibi to cover up his involvement.

In reviewing all of Mary's statements with our standard of review for mistrials, we find no error.  A mistrial is a drastic remedy that should be granted only when justice cannot be served by continuing the trial. *Taylor v. State*, 2010 Ark. 372, 372 S.W.3d 769.  The trial court has the sound discretion to decide whether to grant a mistrial, and this decision will not

be overturned absent a showing of abuse or upon manifest prejudice to the complaining party.

*Green I*, 365 Ark. 478, 231 S.W.3d 638; *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000).

Additionally, even where a remark is improper, the trial court may deny the mistrial motion

and cure any prejudice by admonishing the jury to disregard the remark. *Smith v. State*, 351

Ark. 468, 95 S.W.3d 801 (2003); *Dandridge v. State*, 292 Ark. 40, 727 S.W.2d 851 (1987).

We find no error and affirm the circuit court's rulings regarding Mary's testimony.

V. *Billy Dale Green's Testimony*

For his fifth point on appeal, Billy asserts that the circuit court erred when it did not

grant a mistrial during his own testimony during cross-examination. Billy asserts that during

his cross-examination the State violated *Doyle v. Ohio*, 426 U.S. 610 (1976), and used Billy's

right to silence against him in violation of *Doyle*.

At issue is the following colloquy:

| | |
|---|---|
| PROSECUTOR: | Now, you know that Chad was tried in September of 2011, right? |
| BILLY: | Yes, sir. |
| PROSECUTOR: | So who did you contact even after Chad's trial when you knew exactly . . . |
| DEFENSE ATTORNEY: | Objection. Can we approach your honor? |

The circuit court sustained the objection to the question, denied the motion for

mistrial and gave the jury a cautionary instruction. Billy objected to a cautionary instruction

and asserted that it would not cure the alleged error. The circuit court overruled the

objection and gave the following instruction:



[T]he last question that was asked, who did you contact then after Chad's trial, being objected to, the court has sustained the objection and is instructing you to disregard that utterance . . . in rendering your decision.

The Court in *Doyle* held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id*. at 619. This court similarly held in *Jarreau v. State*, 291 Ark. 60, 722 S.W.2d 565 (1987), and in *Clark v. State*, 256 Ark. 658, 509 S.W.2d 812 (1974). In *Holden v. State*, 290 Ark. 458, 462, 721 S.W.2d 614, 616 (1986) we stated that the "issue . . . is whether [the statement] was a comment on the right of a defendant to remain silent." We concluded that the case was not exactly the same as in *Doyle*. "There was no direct reference by the State to the defendant's silence or emphasis that the defendant refused to make a statement, which is the error addressed in *Doyle*." *Id*., 721 S.W.2d at 616.

As stated previously, a mistrial is an extreme and drastic remedy to be resorted to only when there has been an error so prejudicial that justice cannot be served by continuing the trial. *Russell v. State*, 306 Ark. 436, 815 S.W.2d 929 (1991). Because the record fails to demonstrate that the circuit court abused its discretion in denying Billy's motion for mistrial on this point, we affirm the circuit court on Billy's fifth point on appeal.

## VI. *Cumulative Error*

For his sixth point on appeal, Billy asserts that the circuit court erred when it denied his motion for a mistrial based on cumulative error. Specifically, Billy made three motions for mistrial during the trial and asserts that in three instances the circuit court allowed impermissible Rule 404(b) testimony with regard to Bonnie's testimony, Samons's testimony,

SLIP OPINION

and Mary's testimony. Additionally, Billy asserts that the circuit court erred when it denied his motion for a mistrial during Billy's cross-examination on his allegation that his rights under *Doyle* were violated. Billy asserts that the circuit court erred in denying these motions and the limiting instructions did not cure the errors. Citing *Dillon v. State*, 311 Ark. 529, 844 S.W.2d 944 (1993), he asserts that the cumulative effect of these alleged errors denied him his right to a fair trial.

Having found that Billy's allegations of error were not errors we hold that Billy's cumulative-error argument is without merit. "This court does not recognize the cumulative-error doctrine when there is no error to accumulate." *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000); *Nooner v. State*, 322 Ark. 87, 907 S.W.2d 677 (1995). We affirm the circuit court on Billy's sixth point on appeal.

## VII. *AMI Crim. 2d 401 and 404 Jury Instructions on Accomplice Liability*

For his seventh point on appeal, Billy asserts that it was error for the circuit court to instruct the jury on accomplice liability. Billy contends that the State failed to demonstrate that more than one person was involved with the Elliott murders, and therefore it was error to give the accomplice instructions. Further, Billy contends that we should not consider Shockey's testimony, as he is unreliable, but we should remove his testimony as we do an accomplice's testimony, and then determine whether the evidence supported giving the accomplice instruction. Billy contends that once Shockey's testimony is removed, the State has not demonstrated that Billy was an accomplice. However, Billy cites no authority to support his assertion that Shockey's testimony should be treated as accomplice testimony.

34

SLIP OPINION

"We do not address arguments that are not supported by authority or convincing argument."

*Sweet v. State*, 2011 Ark. 20, 18, 370 S.W.3d 510, 523.

At issue are AMI Crim. 2d 401 and 404, which instruct the jury on accomplice

liability. The following instruction was given to the jury:

> In this case, the State does not contend that Billy Dale Green acted alone in he commission of the offense of Capital Murder of Carl Elliott, Lisa Elliott, Gregory Elliott or Felicia Elliott. A person is criminally responsible for the conduct of another person when he is an accomplice in the commission of an offense.
>
> An accomplice is one who directly participates in the commission of an offense or who, with the purpose of promoting or facilitating the commission of an offense:
>
> Solicits, advises, encourages or coerces the other person to commit the offense, or aids, agrees to aid, or attempts to aid the other person in planning or committing the offense.

"Our case law is clear that a party is entitled to a jury instruction when it is a correct

statement of law and when there is some basis in the evidence to support giving the

instruction." *Wilson v. State*, 364 Ark. 550, 554, 222 S.W.3d 171, 175 (2006). Further, "[a]n

instruction should only be excluded when there is no rational basis for giving it. A trial

court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of

discretion." *Grillot v. State*, 353 Ark. 294, 318, 107 S.W.3d 136, 150 (2003).

With regard to accomplice liability, when two or more persons assist one another in

the commission of a crime, each is an "accomplice" and is criminally liable for the conduct

of both, and one participant cannot disclaim responsibility because he did not personally take

part in every act that went to make up the crime as a whole. Ark. Code Ann. § 5-2-403.

Further, "[w]hen two persons assist one another in the commission of a crime, each is an

35

accomplice and criminally liable for the conduct of both." *Parker v. State*, 265 Ark. 315, 325, 578 S.W.2d 206, 212 (1979). Finally, as discussed previously, "we do not pass upon the credibility of the witnesses and have no right to disregard the testimony of any witness after the jury has given it full credence, where it cannot be said with assurance that it was inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ thereon." *Davenport*, 373 Ark. at 73, 281 S.W.3d at 270.

Here, the testimony from Peretti, Shockey, Mary, Jason, Amber, and Billy all support the theory that Billy was either a principal or an accomplice in the Elliott murders. Dr. Peretti testified that one or more persons could have committed the homicides, and three different weapons, a small-caliber gun, a knife, and a tire tool, were used to kill the Elliotts. Shockey testified that Billy confessed to killing Felicia and to concealing the other three homicides from law enforcement. Mary testified as to Billy's relationship with the Elliotts, Billy's disagreement with Carl, that Billy always carried a knife and a pistol, that Billy received a phone call from Chad the night of the murders, and that Billy left to join Chad to clean up "Chad's mess" in a trench coat the night of the murders with plenty of time to reach the Elliotts before the police-scanner report of the disturbance in Dalton. Billy later told Mary to lie about his whereabouts on the night of the murders. Jason testified that Billy always carried a knife and told the family to tell police that Billy was home on the night of the murders. Amber told police that Billy received the phone call from Chad the night of the murders and went to help Chad. She also testified that she heard on the police-scanner about the domestic-disturbance call in Dalton that night. Finally, Billy's own testimony supports that

SLIP OPINION

Billy was an accomplice.

In reviewing the testimony supporting the accomplice instructions, it cannot be said with assurance that the testimony, including Shockey's, was inherently improbable, physically impossible, or so clearly unbelievable that reasonable minds could not differ. *See id.* Accordingly, we hold that the circuit court did not abuse its discretion in giving the accomplice instruction. We affirm the circuit court on this point.

## VIII. *Juror Pyles*

For his eighth point on appeal, Billy asserts that the circuit court erred by denying his motion to remove Juror Pyles, a part-time 911 operator, for cause because she worked at the sheriff's office and was biased. After the circuit court denied Billy's request to remove Pyles for cause, Billy used a peremptory strike and removed Pyles. Billy now asserts that he was forced to use his peremptory strike on Pyles, forcing him to accept Juror Blevins, whose brother-in-law was a reserve officer in the Randolph County Sheriff's Office. Billy argues on appeal that the circuit court erred in not removing Pyles for cause.

In order to challenge a juror's presence on appeal, the appellant must have exhausted his peremptory challenges and must show that he was forced to accept a juror who should have been excused for cause. *Willis v. State*, 334 Ark. 412, 977 S.W.2d 890 (1998). In other words, Billy "must have asked the court to remove the juror for cause, and the court must have improperly denied the request." *Id.* at 415, 977 S.W.2d at 894–95.

Here, the record demonstrates that Billy did not challenge Juror Blevins for cause. Accordingly, Billy has failed to prove that the seated juror was forced on him or that she

should have been excused for cause. Thus, Billy's eighth point on appeal is without merit and we affirm the circuit court.

## IX. *Motion to Settle the Record*

For his ninth point on appeal, Billy asserts that the circuit court erred by not ruling on his motion to settle the record as to portions of the bench conference regarding his challenge to Juror Pyles for cause.

In *Jacobs v. State*, 327 Ark. 498, 939 S.W.2d 824 (1997), we stated that the trial court has an affirmative duty to see that the court reporter performs satisfactorily in order to provide an adequate record for appeal. "When life sentences are involved, the record must be sufficient to review all errors prejudicial to the defendant under Supreme Court Rule 4–3(h), which necessitates that the appellant abstract all rulings adverse to him." *McGehee v. State*, 328 Ark. 404, 413–14, 943 S.W.2d 585, 590 (1997).

Here, in reviewing the record, we hold that Billy's ninth point lacks merit. Billy fails to show how any inaudible portions of the record affected the merits of his claim. The record and the supplemental record demonstrate Billy's challenge to Pyles for cause after she told them she worked at the sheriff's office part-time. It further demonstrates that Pyles specifically stated that she could be fair and impartial despite her position as a 911 operator for the State. Also, as discussed in the previous point on appeal, Billy's claim regarding Juror Pyles fails because he did not challenge Juror Blevins for cause. Thus, the inaudible portions of the record have no bearing on the merits of Billy's claim. Therefore, we affirm the circuit court

SLIP OPINION

on this point.

## X. *Amended Order*

For his final point on appeal, Billy asserts that the circuit court erred by amending its judgment-and-conviction order because the circuit court lacked jurisdiction. He requests that this court strike the circuit court's amended order.

On October 12, 2012, the circuit court entered an amended order to add the requirement that Billy register as a sex offender and pay fees pursuant to Ark. Code Ann. §§ 12-12-903, -905 and -910 (Repl. 2003). Billy does not challenge the sexual-offender registration requirements.

In *McCuen v. State*, 338 Ark. 631, 999 S.W.2d 682 (1999), we addressed a similar situation with regard to an amended order. In that case, the circuit court entered a judgment-and-commitment order nunc pro tunc in which he stated that a $30,000 fine had been "inadvertently omitted" from the original judgment. We affirmed the corrected order and explained that "a subsequent judgment entered nunc pro tunc to correct an erroneous judgment to speak the truth was the appropriate course for the trial judge to take." *McCuen*, 338 Ark. at 635, 999 S.W.2d at 684.

*McCuen* is on point. In Billy's case, we hold that the circuit court did not abuse its discretion in entering the amended order, and affirm on this point.

### *Conclusion*

Based on the foregoing discussion, we find no error and affirm Billy's convictions and

sentences.

In compliance with Ark. Sup. Ct. R. 4–3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Billy, and no prejudicial error has been found.

Affirmed.

HANNAH, C.J., CORBIN and DANIELSON, JJ., concurring in part and dissenting in part.

**JIM HANNAH, Chief Justice, concurring in part and dissenting in part.** I respectfully dissent to the majority's holding that substantial evidence supports the jury's verdict that Billy Dale Green committed, or was an accomplice to, the murders of Carl, Lisa, and Gregory Elliott. The evidence outlined by the majority may constitute substantial evidence that Billy assisted his son Chad in "cleaning up" after the murders; however, it is that same evidence that clearly forced the jury to resort to speculation and conjecture as to Billy's actual involvement in the murders.

Indeed, there was testimony that Billy was known to carry a knife and that some of the wounds suffered by the victims were consistent with having been caused by a knife. And too, Billy went to "clean up Chad's mess" and told his family to lie about his whereabouts on the night of the murders. Finally, there was evidence to suggest that Billy had time to get to the Elliotts' home before the disturbance call was heard over the police scanner. However, this evidence is merely circumstantial in nature; the State offered no direct evidence whatsoever to place Billy at the scene at the time Carl, Lisa, and Gregory were murdered, nor was it

shown by the evidence that these three victims were alive immediately before the disturbance call went out on the police scanner.

Regardless of whether evidence is direct or circumstantial, it must still meet the requirement of substantiality—it must force the fact-finder to reach a conclusion one way or the other without resorting to speculation or conjecture. *Chism v. State*, 312 Ark. 559, 853 S.W.2d 255 (1993). Because there is a noticeable absence of substantial evidence in this case, the majority must rely on inferences drawn from the evidence presented by the State to conclude that Billy committed, or was an accomplice to, the murders of Carl, Lisa, and Gregory. However, "[w]here inferences are relied upon, they should point to guilt so clearly that any other conclusion would be insufficient. This is so regardless of how suspicious the circumstances are." *Hodge v. State*, 303 Ark. 375, 379, 797 S.W.2d 432, 435 (1990) (quoting *Ravellette v. State*, 264 Ark. 344, 347, 571 S.W.2d 433, 435 (1978)). I cannot say that the evidence presented by the State in this case meets that requirement as to the murders of Carl, Lisa, and Gregory. Therefore, I dissent on this issue. I concur that substantial evidence supports the kidnapping and capital-murder convictions regarding Felicia, and I concur in the remaining holdings of the majority.

CORBIN and DANIELSON, JJ., join.

*Montgomery, Adams & Wyatt, PLC*, by: *James W. Wyatt* and *Dale E. Adams*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Laura Shue*, Ass't Att'y Gen., for appellee.